IN RE APPLICATIONS OF UNITED AIR LINES, INC.
UNITED AIR LINES, INC., APPELLANT, v. NEBRASKA STATE RAILWAY COMMISSION, APPELLEE.
112 N. W. 2d 414

Filed December 1, 1961. Nos. 34980, 34987, 34988, 34989, 35022.

Kennedy, Holland, DeLacy & Svoboda, Clarence E. Heaney, Jr., J. Stanley Stroud, and Robert D. Skochdopole, for appellant.

Clarence A. H. Meyer, Attorney General, and Homer G. Hamilton, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SIMMONS, C. J.

This opinion decides five appeals from parts of orders of the Nebraska State Railway Commission, hereinafter called the commission. The appellant in each instance is the United Air Lines, Inc., hereinafter called United. We reverse the orders of the commission on the principal issue involved in the appeals.

Three of the five appeals may be rather quickly disposed of on the principal issue presented by the appeals. There will remain one question common to all five appeals which we take up at the conclusion of this opinion.

In our number 34987, United petitioned for an order disclaiming jurisdiction, or, in the alternative, authorizing the issuance of shares of its common stock heretofore reserved for key management personnel under applicants' restricted stock option plan.

The commission refused to grant the request for a waiver or disclaimer of jurisdiction of the subject matter of the application and granted the alternative prayer of the application.

Pursuant to section 75-710, R. R. S. 1943, the commission required United to pay $300 as a condition precedent to the issuance of its order authorizing the issuance of the securities involved. United made the payment of $300 without prejudice to its right to question the jurisdiction of the commission over the applicant or

to require the payment of the statutory fee.

In our number 34988, United asked for an order disclaiming jurisdiction, or, in the alternative, authorizing the payment of a 3 percent stock dividend. As in case number 34987, the commission overruled the United request for a waiver or disclaimer of jurisdiction and granted the alternative prayer. The statutory filing fee was paid under the conditions above-stated in the sum of $162.60.

In our number 35022, United made application for an order disclaiming jurisdiction, or, in the alternative, authorizing the issuance of preferred and common stock, and stock warranties in connection therewith, and approving proposed consolidations with Capital Airlines, Inc. As in the other cases, the commission denied the request to disclaim jurisdiction, granted the application, and required the payment of the statutory filing fee of $1,000 which was done under the conditions above-stated.

The Attorney General here disclaims jurisdiction in the commission in the above three cases. No issue being presented, we reverse the orders in the above cases so far as the jurisdictional issue presented here is concerned.

This brings us to the two cases on which the parties present issues here.

In our number 34980, United petitioned for an order of the commission disclaiming jurisdiction, or, in the alternative, authorizing the issuance by United of its subordinated debentures in the principal amount of $25,000,000 and its common stock issuable upon conversion of said debentures, and finding that the issue of its debentures is reasonably required for the purposes of the corporation. The commission denied the order of disclaimer of jurisdiction and granted the alternative prayer upon conditions not important here. The commission required the payment of the statutory fee of $1,000 which was paid subject to the conditions expressed above.

The final case of the series is our number 34989, wherein United prayed for an order disclaiming jurisdiction, or, in the alternative, approving an amendment to a credit agreement between applicant and the First National City Bank of New York with reference to bank borrowings, and authorizing issuance of promissory notes pursuant to said amendment. The commission denied the request for a disclaimer of jurisdiction and granted the alternative prayer to issue notes in the sum of $165,-000,000. As in the other cases, United was required to pay the statutory filing fee in the sum of $1,000.

The two issues presented here are: First, the jurisdiction of the commission over the subject matter of the last two above-recited applications. Second, if the above issue is decided in favor of United, United requests that we order a return of the fees paid.

There is no issue of fact presented.

United is a corporation organized and existing under the laws of Delaware. It is qualified to do business in Nebraska. Its principal office is located in Illinois.

Pursuant to authority conferred by certificates of public convenience and necessity issued to it by the Civil Aeronautics Board under the federal Aviation Act of 1958, as amended, United is engaged in the transportation of persons, property, and mail by aircraft over a transcontinental route which connects cities on both the east and west coasts and Hawaii, as well as intermediate cities, including Omaha and Lincoln, Nebraska. United does intrastate or interstate business in 23 states, the District of Columbia, and British Columbia, Canada. United holds, among other certificates, a certificate of public convenience and necessity issued by the Nebraska State Railway Commission authorizing it to provide intrastate transportation of persons and property by aircraft between Omaha and Lincoln, Nebraska.

In 1959 United flew 134,200 revenue passenger miles in the transportation of Lincoln-Omaha passengers, which was three one-thousandths of one percent of

United's system revenue passenger miles flown in 1959, which total mileage was 5,160,757,000 revenue passenger miles. United's intrastate mileage of 55 miles between Lincoln and Omaha amounts to but 0.47 percent of the 11,613 unduplicated route miles in its system.

Applicant's real and personal property in Nebraska as of January 1, 1960, totaled $1,200 in Lincoln and $97,680 in Omaha. This is less than ⅓ of 1 percent of the total value of United's real and personal property.

United, as of the time of the hearings, had an authorized capitalization of 600,000 shares of preferred stock of the par value of $100 per share, issuable in series, none of which were issued and outstanding and in respect of which no series has been designated, and 5,000,000 shares of common stock of the par value of $10 per share. As of November 30, 1960, 4,087,054 shares of common stock were issued and outstanding. United had a capital surplus in the amount of $51,701,464; earned surplus in the amount of $50,321,152 plus earned surplus appropriated for self-insured risks in the amount of $5,000,000; and long-term debts outstanding in the amount of $219,-052,000. As of September 30, 1960, United's assets, including cash in the amount of $25,103,662 and operating property and equipment, less depreciation reserves in the amount of $183,788,871, totaled $483,527,522. United's net earnings and gain on sale of aircraft, after income taxes, for the year ending December 31, 1959, totaled $13,798,621 and for the 9 months ending September 30, 1960, $9,711,536.

The number of United's stockholders in Nebraska is 155, which is less than 1 percent of the total number of United's stockholders.

The facts having special reference to each of the applications herein involved are set out below.

Substantially all of the money raised and to be raised by the issue of debentures is to be expended beyond the limits of the State of Nebraska in the acquisition of new aircraft equipment and the acquisition, exten-

sion, improvement, and maintenance of United's facilities. These debentures are to be issued under an indenture between United and First National City Trust Company as trustees. Said debentures are wholly unsecured.

Said indentures bear date as of December 1, 1960.

Said debentures have been duly registered with the Securities and Exchange Commission under the federal Securities Act of 1933, as amended.

On December 20, 1957, United entered into a credit agreement with the First National City Bank of New York. This was an agreement whereby United could borrow through a group of banks headed by the First National City Bank of New York the sum of $130,000,000 on short-term, 90-day notes until December 31, 1960, at which time the outstanding short-term notes would be converted into a long-term note. This was an agreement between United and the several banks wherein the banks agreed to loan United money at certain times and in a certain method and evidenced by certain characters of notes. It had reference strictly to bank borrowings.

The agreement was amended on November 30, 1960. There were four major changes in this amendment. First, the amount of the borrowings was increased from $130,000,000 to $165,000,000. Second, it made certain restrictions on stock payments such as cash dividends, etc. Third, it took into consideration the issuance of the $25,000,000 subordinated debentures, which was the subject matter of Application No. 22539. Fourth, it broadened the definition of "net worth" to include the subordinated debentures and any other indebtedness subordinated in terms satisfactory to the bank.

Thus, the commitment of the banks with reference to loans to United was increased by $35,000,000.

The amendment provided that the borrowings should be evidenced by short-term notes, 90-day notes, and extended the date when the short-term notes would be

consolidated into one long-term note from December 31, 1960, to June 30, 1962.

The practice has been to pay off each 90-day note at maturity and then borrow an equivalent amount and issue a new note. Should the short-term borrowings be paid up by June 30, 1962, then there would be no long-term note.

The net book worth of United's operating property and equipment as of October 31, 1960, as shown by the balance sheet of that date, was $389,456,000.

The particular statute involved is section 75-704, R. R. S. 1943: "A common carrier or public service corporation doing business in the State of Nebraska, may issue stocks, bonds, notes or other evidence of indebtedness, payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property, the construction, completion, extension or improvement of facilities, or for the improvement or maintenance of its service, or for the discharge or lawful refunding of its obligations; *Provided,* and not otherwise, there shall have been secured from the State Railway Commission an order authorizing such issue and the amount thereof, and stating that in the opinion of the commission the use of the capital to be secured by the issue of such stock, bonds, notes or other evidence of indebtedness is reasonably required for the said purposes of the corporation."

This act was first passed in 1909. Laws 1909, c. 108, § 1, p. 428. It was then made to apply to: "A common carrier or public service corporation organized and incorporated or hereafter incorporated, under or by virtue of the laws of the state of Nebraska, * * *."

In 1923 the act was amended so as to apply to: "A common carrier or public service corporation doing business in the state of Nebraska, * * *." Laws 1923, c. 168, § 1, p. 398. It will be noted that the amendment of 1923 extends the reach of the place of organization of the corporation. It limited its application to a common

carrier or public service corporation doing business in Nebraska. We find nothing in the legislative or judicial history of the period that might show a reason for the above change. It is apparent that the Legislature shifted its concern from the concept of a corporation incorporated under the laws of this state to that of concern as to a corporation doing business in this state, no matter where organized.

The question then is one of the extent of the reach of the act as it now exists in section 75-704, R. R. S. 1943.

The Legislature in the same act put in an additional provision, now section 75-709, R. R. S. 1943, providing that the provisions of this act "* * * shall not apply to common carriers, the security issues of which are under the control of the Interstate Commerce Commission." Laws 1923, c. 168, § 1, p. 400. Here the Legislature did limit the reach of the act so as to exclude great numbers of interstate common carriers. The language is indicative of a legislative intent only, for at that time great interstate common carriers by air were not in existence. As such, they need not be put without the reach of the act.

There is another legislative amendment, now section 75-705, R. R. S. 1943, enacted in 1925. Laws 1925, c. 141, § 1, p. 371. It provided: "The commission may, in its discretion, prescribe rules and regulations for the keeping of accounts of any corporation or company subject to this act."

This language may be rationally applied to corporations whose business is exclusively or largely restricted to Nebraska; or stated otherwise, show they are in effect Nebraska operating corporations no matter where organized. To require an interstate carrier of the size and scope of operation of United to comply with it goes beyond the scope of a reasonable application of a sound legislative requirement. If Nebraska has power to make that requirement, then every other state where United operates could have like power. The result would be

unjustifiably expensive, and near chaos in the keeping of accounts of such a carrier. We do not ascribe such a purpose to the Legislature.

In Simpson v. Shepard, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. N. S. 1151, Ann. Cas. 1916A 18, it was held: "The grant in the Constitution of its own force, that is, without action by Congress, established the essential immunity of interstate commercial intercourse from the direct control of the States with respect to those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed by a single authority. It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation the power of Congress is exclusive."

In Northwest Airlines, Inc. v. Minnesota, 322 U. S. 292, 64 S. Ct. 950, 88 L. Ed. 1283, 153 A. L. R. 245, Justice Jackson in a concurring opinion said: "Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government."

Threaded through the decisions of the Supreme Court of the United States is a consistent rule that places the subject matter of the applications here involved beyond state control.

State ex rel. Barrett v. Kansas Natural Gas Co., 265

U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027, was an interstate gas case. The court held: "Transportation of gas from one State to another is interstate commerce; and the sale and delivery of it to the local distributing companies is a part of such commerce. In Public Utilities Comm. v. Landon, supra, at p. 245, this Court said: 'That the transportation of gas through pipe lines from one State to another is interstate commerce may not be doubted. Also, it is clear that as part of such commerce the receivers might sell and deliver gas so transported to local distributing companies free from unreasonable interference by the State.' * * * The line of division between cases where, in the absence of congressional action, the State is authorized to act, and those where state action is precluded by mere force of the commerce clause of the Constitution, is not always clearly marked. In the absence of congressional legislation, a State may constitutionally impose taxes, enact inspection laws, quarantine laws and, generally, laws of internal police, although they may have an incidental effect upon interstate commerce. * * * But the commerce clause of the Constitution, of its own force, restrains the States from imposing direct burdens upon interstate commerce."

Quoting from Simpson v. Shepard, *supra*, the court held: " 'If a state enactment imposes a *direct burden* upon interstate commerce, it must fall regardless of Federal legislation. The point of such an objection is not that Congress has acted, but that the state has directly restrained that which in the absence of Federal regulation should be free.' "

Southern Pacific Co. v. Arizona ex rel. Sullivan, 325 U. S. 761, 65 S. Ct. 1515, 89 L. Ed. 1915, involved the validity of a state law regulating the length of trains. The court held: "* * * the states may regulate matters which, because of their number and diversity, may never be adequately dealt with by Congress. * * * When the regulation of matters of local concern is

local in character and effect, and its impact on the national commerce does, not seriously interfere with its operation, and the consequent incentive to deal with them nationally is slight, such regulation has been generally held to be within state authority. * * * In the application of these principles some enactments may be found to be plainly within and others plainly without state power. But between these extremes lies the infinite variety of cases, in which regulation of local matters may also operate as a regulation of commerce, in which reconciliation of the conflicting claims of state and national power is to be attained only by some appraisal and accommodation of the competing demands of the state and national interests involved. * * * For a hundred years it has been accepted constitutional doctrine that the commerce clause, without the aid of Congressional legislation, thus affords some protection from state legislation inimical to the national commerce, and that in such cases, where Congress has not acted, this Court, and not the state legislature, is under the commerce clause the final arbiter of the competing demands of state and national interests. * * * If one state may regulate train lengths, so may all the others, and they need not prescribe the same maximum limitation. The practical effect of such regulation is to control train operations beyond the boundaries of the state exacting it because of the necessity of breaking up and reassembling long trains at the nearest terminal points before entering and after leaving the regulating state. The serious impediment to the free flow of commerce by the local regulation of train lengths and the practical necessity that such regulation, if any, must be prescribed by a single body having a nation-wide authority are apparent."

The above language goes to that position heretofore mentioned that if Nebraska can require a certain system of accounts, then every other state through which United

operates may do so. Of course, it relates also to the main issue here presented.

. In Morgan v. Virginia, 328 U. S. 373, 66 S. Ct. 1050, 90 L. Ed. 1317, 165 A. L. R. 574, the court said: "The precise degree of a permissible restriction on state power cannot be fixed generally or indeed not even for one kind of state legislation, such as taxation or health or safety. There is a recognized abstract principle, however, that may be taken as a postulate for testing whether particular state legislation in the absence of action by Congress is beyond state power. This is that the state legislation is invalid if it unduly burdens that commerce in matters where uniformity is necessary - necessary in the constitutional sense of useful in accomplishing a permitted purpose. Where uniformity is essential for the functioning of commerce, a state may not interpose its local regulation. Too true it is that the principle lacks in precision. Although the quality of such a principle is abstract, its application to the facts of a situation created by the attempted enforcement of a statute brings about a specific determination as to whether or not the statute in question is a burden on commerce. Within the broad limits of the principle, the cases turn on their own facts."

United does not here challenge the constitutionality of the act, but rather challenges the construction placed on it by the commission, which makes an unconstitutional result.

The Attorney General argues that the federal government has not pre-empted the field in the regulation of interstate carriers such as are here involved and hence the state is not precluded from exercising its authority. He places reliance upon Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 341 U. S. 329, 71 S. Ct. 777, 95 L. Ed. 993, and other cases of like import. We need but quote from the concluding paragraph of the majority opinion in the above-cited case: ":It does not follow that because appellant is engaged

in interstate commerce it is free from state regulation or *free to manage essentially local aspects of its business as it pleases.* The course of this Court's decisions recognizes no such license." (Emphasis supplied.)

But here the applications of United cannot be said to deal with essentially local aspects of United's business. Here the applications go to the very heart of United's interstate business, that of financing purchases of extensive equipment for use in interstate commerce, and the consolidation of United with a large interstate air carrier. Local interests are only incidentally involved, if involved at all.

We hold that the matters involved in these applications are not subject to state control and hence that the orders of the commission here involved are invalid as being beyond the power of the commission to make. The commission's authority does not extend its reach that far.

There remains one further matter common to all five appeals. Pursuant to the provisions of section 75-710, R. R. S. 1943, United paid to the commission in each of these cases the statutory fee. It now asks that we order a refund.

It will be noted that the above section requires that the fees so paid be paid into the state treasury to the credit of the General Fund. So far as we have observed, the record does not show more than payment to the commission. We properly assume that the commission has obeyed the law and paid the funds into the state treasury.

It is obvious that United, in order to expeditiously secure a clear runway to carry out its interstate operations, paid these fees. There was not time to wait the process of a judicial determination of its rights and liabilities. However, no authority is cited to us which gives us the power in this appeal to grant the relief asked.

The request for a refund order must accordingly be

denied without prejudice to the rights or procedures of United in the matter. To the extent here stated, the orders of the commission are reversed.

REVERSED.