PANHANDLE EASTERN PIPE LINE COMPANY, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

(No. 78-170—Decided December 7, 1978.)

336

*Messrs. Squire, Sanders & Dempsey, Mr. Alan C. Buchmann, Mr. George R. Barry, Mr. Mark A. Cusick, Messrs. Laylin & Shawan, Mr. Edward H. Laylin* and *Mr. David H. Shawan,* for appellant.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Ms. Judith B. Sanders,* for appellee.

CELEBREZZE, J. The sole issue before this court can be phrased as follows: Does the requirement embodied in R. C. 4905.40 through 4905.42, that a public utility may not issue securities with a maturity exceeding one year without first obtaining approval of the Public Utilities Commission, as applied to appellant, violate the Commerce Clause of the United States Constitution by placing an undue burden on interstate commerce?

R. C. 4905.40 prohibits a public utility from issuing stocks, bonds, notes, or other evidences of indebtedness

payable at periods of more than 12 months after their date of issuance unless the proceeds are used for one or more of the purposes specified in that statute and unless there is commission approval. A perusal of the statute reveals that prior approval is required for "all proposed issues of stock and most proposed issues of debt securities by a public utility where the purpose of the issuance is to finance capital improvements, to reorganize the capital structure, to refund certain obligations incurred or to acquire the stock of another public utility." *International T. & T. Corp.* v. *Pub. Util. Comm.* (1969), 18 Ohio St. 2d 83, 84-85.

R. C. 4905.41 further provides that a prerequisite to approval is the filing of a signed and verified statement by the utility containing the detailed information described in that statute. In addition, R. C. 4905.42 describes the process whereby the commission proceeds to a determination of whether an issuance is justified and sets forth the broad scope of its investigative process:

"To determine whether it should issue the order referred to in section 4905.40 of the Revised Code, the public utilities commission shall hold such hearings, make such inquiries or investigations, and examine such witnesses, books, papers, documents, and contracts *as it deems proper.*" (Emphasis added.)

The statute goes on to indicate the consequence of an issuance proceeding without the requisite approval: "All stocks, bonds, notes, or other evidence of indebtedness, issued by any public utility or railroad *without the permission of the commission are void.*" (Emphasis added.)

Not only is the commission given extensive authority to investigate and review the issuance of a utility's securities under the forgoing statutes, but its jurisdiction is a continuing one incorporating the power to amend, vacate, or suspend an original order authorizing such an issuance. *International Telepost Co., Inc.,* v. *Pub. Util. Comm.* (1929), 119 Ohio St. 632, 641.

Before turning to an assessment of the impact the foregoing statutes have on appellant's activities in interstate

commerce a critical distinction must be made. We are not dealing with any arguments that the statutes are unconstitutional on their *face*, but merely as they are *applied*. The right of the General Assembly to enact such legislation has not been questioned. The delegation of such power to supervise the issuance of securities is wholly within the state police power and the paramount purpose of such authority is the protection and enforcement of the rights of the public. 64 American Jurisprudence 2d 761-62, Public Utilities, Section 255; Annotation 41 A. L. R. 889, 891; *Lima Toledo Rd. Co.* v. *Pub. Util. Comm.* (1923), 108 Ohio St. 330, 332.[4]

Conceding the facial validity of the statutes and the constitutional foundation underlying their enactment, our next concern is whether their application, in this instance, amounts to a constitutionally impermissible regulation of interstate commerce.

As a general rule the regulation of interstate commerce is left to the federal government by the United States Constitution. States may regulate areas of interstate commerce which are local in nature as long as such regulation does not impose an undue burden on the flow of that commerce. Thus, the states do have authority over the essentially local concerns of utilities engaged in interstate commerce. *Panhandle Eastern Pipe Line Co.* v. *Michigan Public Service Comm.* (1951), 341 U. S. 329.

It is the function of this court to examine the local interests served by commission regulation of appellant's securities and then balance those concerns against the burden placed on interstate commerce. Regulation rises to the level of an undue burden if it may seriously interfere with or "impede substantially" the free flow of commerce between the states. *Southern Pacific Co.* v. *Arizona* (1945), 325 U. S. 761, 767; *Bibb* v. *Navajo Freight Lines, Inc.* (1959), 359

---

[4]See, also, Comment, State Regulation of Interstate Utility Securities—The Need for a Reappraisal, 32 J. Air. L. & Comm. 262 (1966); Rosenbaum, Regulation of Security Issues by the Ohio Public Utilities Commission, 4 Cinn. L. Rev. 321 (1930).

U. S. 520. In addition, the United States Constitution prohibits the states from controlling "those phases of the national commence" where there is a need for "national uniformity." *Southern Pacific, supra,* at page 767. The test for ascertaining whether uniformity is required has been explained as follows:

"There is a recognized abstract principle, however, that may be taken as a postulate for testing whether particular state legislation in the absence of action by Congress is beyond state power. This is that the state legislation is invalid if it *unduly burdens that commerce in matters where uniformity is necessary—necessary in the constitutional sense of useful in accomplishing a permitted purpose.* Where uniformity is essential for the functioning of commerce, a state may not interpose its local regulation." *Morgan* v. *Virginia* (1946), 328 U. S. 373, 377. (Emphasis added.)

The record clearly indicates that the bulk of appellant's activities involves the interstate transmission and sale of natural gas, which, in turn, has been held to be interstate commerce. *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm.* (1947), 332 U. S. 507, 512-513. Furthermore, the fact that some of appellant's sales are made directly to industrial customers, as opposed to "sales for resale," does not change the interstate characteristics of the company's overall operations.

In order to determine whether the necessity of commission approval for the issuance of securities imposes an "undue burden" on interstate commerce, guidance can be obtained from other state Supreme Court decisions dealing with similar legislation. See *State ex rel. Utilities Comm., v. Southern Bell Tel. & Tel. Co.* (1975), 288 N. C. 201, 217 S. E. 2d 543; *United Air Lines, Inc.,* v. *Illinois Commerce Comm.* (1965), 32 Ill. 2d 516, 207 N. E. 2d 433; *United Air Lines, Inc.,* v. *Nebraska State Ry. Comm.* (1961), 172 Neb. 784, 112 N. W. 2d 414.

The most recent decision dealing with such regulation is *Southern Bell Telephone, supra.* Southern Bell was a

public utility incorporated in New York State, but furnishing intrastate, interstate and foreign telecommunication services to customers in North Carolina, South Carolina, Georgia, and Florida. In 1973, the North Carolina Utilities Commission asserted jurisdiction over one of Southern Bell's securities issues under a law similar to R. C. 4905.40 *et seq.*

The court recognized the potential burden on the interstate flow of telecommunications because of the crucial interrelationship between the operation of the corporation and its ability to continue to issue securities:

"Clearly the right to raise money to carry on the business of interstate telecommunications is an *essential part of the operation for, if the utility cannot secure funds through the sale of its securities, it cannot function.* If the Commerce Clause is broad enough to include telecommunications, it is broad enough to include the *means without which* such communication cannot be furnished." *Southern Bell, supra,* at page 209. (Emphasis added.)

Having established the importance of that financing, the court went on to conclude that the necessity of "prior approval" amounted to an "impermissible burden on interstate commerce," stating, at page 212, as follows:

"Any requirement for prior approval, by its very nature, contemplates that such approval may not be given. If the North Carolina Commission disapproves a proposed securities issue and the Georgia Commission approves it, Southern Bell is stymied, for it is put in an impossible position. In our view, the mere possibility of such a conflict, as applied to Southern Bell under the facts of this case, makes Rule R1-16, and the statutes which authorize the rule, a direct regulation and an impermissible burden on interstate commerce."

The Supreme Court of Illinois found a similar unconstitutional burden in *Illinois Commerce Comm., supra.* United Airlines, Inc., was incorporated in Delaware with executive offices in Illinois. The interstate operations of the company served 110 cities in 32 states, the District of

342

Columbia and Canada. Due to its classification as a public utility operating within the state, United was again subject to state control of the issuance of its securities by statutes similar to those in Ohio.

The Illinois Supreme Court, at page 525, assessed the impact of the statutes and recognized the potential for chaos if each state in which the corporation was doing business decided to assert jurisdiction over its securities:

"If Illinois can exercise the power to approve or disapprove the issuance of United's securities because it transacts business here, then so also can each of the other sixteen States where United provides intrastate service. There would thus be a total of seventeen jurisdictions asserting the power to approve or reject any issuance of stock proposed by United. The task of seeking and gaining approval from such a number of States would be unjustifiably expensive, time consuming and burdensome, and could create delay which would directly impair the usefulness of United's facilities for interstate traffic. Just as important, each independent regulating authority would be required to apply locally defined standards of public interest and locally defined rules in order to approve or disapprove or, as our statute suggests, (sec. 21.) to conditionally approve a single issuance of securities. The result, we believe, would be chaotic. *The issuance of securities is a single, indivisible act. It cannot be fractionalized and given portions allocated to specfic States.*" (Emphasis added.)

The court, as did the North Carolina Supreme Court, held, at page 525, that possessing the power to approve or disapprove an issuance of securities was the equivalent of controlling the financial foundation of a utility and consequently its continued operation:

"The power given the Commission to approve or disapprove the issuance of stocks and securities necessarily affects United's interstate activities, for if it cannot secure funds through the sale of its stocks and securities its continued existence in the highly competitive interstate air

transportation industry would be difficult, if not impossible, to sustain."

The third Supreme Court to deal with a constitutional issue similar to that currently before this court was Nebraska in *Nebraska State Railway Comm.*, *supra*. As with the two aforementioned decisions, the court dealt with statutes requiring prior approval of a securities issuance. The Supreme Court held, at page 796, that for the Nebraska State Railway Commission to assert its statutory authority in this particular instance would not be jusified by any argument that "local interests" were being served:

"But here the applications of United cannot be said to deal with essentially local aspects of United's business. Here the applications go to the very heart of United's interstate business, that of financing purchases of extensive equipment for use in interstate commerce, and the consolidation of United with a large interstate air carrier. Local interests, are only incidentally involved, if involved at all."

The extent of United's "local," intrastate operations was its transportation of persons and property on the 55 mile trip from Lincoln to Omaha amounting to three one-thousandths of one percent of its revenue passenger miles flown during that year. In addition, United's real and personal property in the state amounted to less than 1/3 of 1 percent of the total value of all its real and personal property.

The court also recognized the disruptive effect the application of such a statute would have if similar requirements were adopted in every state in which United conducted its operations, stating at pages 791-792:

"* * * To require an interstate carrier of the size and scope of operation of United to comply with it goes beyond the scope of a reasonable application of a sound legislative requirement. If Nebraska has power to make that requirement, then every other state where United operates could have like power. The result would be unjustifiably expensive, and near chaos in the keeping of accounts of

such a carrier. We do not ascribe such a purpose to the Legislature.''

The fundamental constitutional question arising in the aforementioned decisions is virtually identical to that raised in the present appeal. R. C. 4905.40 through 4905.42 give the Public Utilities Commission total control over the issuance of appellant's securities. As indicated by the decisions of these other Supreme Courts, the application of such a statutory power amounts to commission control over the continued financial well-being of the company.

The disapproval of an issuance could have ramifications throughout appellant's entire interstate operation as increased financing requirements become an ever-present reality. Not only could a disapproval have interstate repercussions but the potential for delay prior to approval by the exercise of the investigatory powers authorized by R. C. 4905.42 could adversely affect both the cost and overall marketability of a proposed issue.

For this court to place a judicial stamp of approval on such a potentially chaotic possibility would be to ignore economic reality. The possibility of the Ohio Public Utilities Commission so disrupting the interstate flow of natural gas, during this period of a growing energy shortage, by itself, clearly places an undue burden on interstate commerce.

The Commerce Clause does not require that the appellant wait until its interstate activities are actually impeded. In addition to the potential burden on interstate commerce that is possible solely by the activity of the Public Utilities Commission, the possibility of conflicting multi-state regulation of appellant's securities is also sufficient to curtail the application of Ohio's statutory scheme. The Illinois Supreme Court came to a similar conclusion and has accurately set forth the general rule:

''It is suggested by the Commission that it is not proper to consider the 'possibility' of multi-state regulation and its effects, the implication being that the limitations on the powers of a State over intersate commerce could

not come into effect until there is an actual attempt at multiple regulation or an actual obstruction of commerce. The cases, however, reject this view and demonstrate that the possibility of conflict, or dual regulation, may be sufficient to curtail powers sought to be asserted by an individual State over interstate commerce where such commerce might be impeded by conflicting and varying regulations. See: *South Covington & Cincinnati Street Railway Co.* v. *City of Covington*, 235 U. S. 537, 35 S. Ct. 158, 59 L. Ed. 350, 354; *Southern Pacific Co.* v. *State of Arizona*, 325 U. S. 761, 773-775, 89 L. Ed. 1915, 1927-1928; *Bibb v. Navajo Freight Lines, Inc.*, 359 U. S. 520, 79 S. Ct. 962, 3 L. Ed. 2d 1003; *Application of United Air Lines, Inc.*, 172 Neb. 784, 112 N. W. 2d 414; *cf. Bethlehem Steel Co.* v. *New York State Labor Relations Board*, 330 U. S. 767, 775, 91 L. Ed. 1234, 1247." *Illinois Commerce Comm., supra* (32 Ill· 2d 516), at pages 525-526.

The potentially chaotic situation that would arise from such "conflicting and varying regulations" also supports the contention that such state regulation should be precluded because national uniformity in this area is "necessary." *Morgan, supra* (328 U. S. 373), at page 377.

Finally, any overriding local interests that would justify the *application* of the statutory scheme, in this *particular* factual setting, have not been substantiated in the record. In fact, were it not for appellant's three "direct sale" customers, comprising less than one percent of its total interstate operation, the company would be relieved of the requirement of seeking commission approval pursuant to the exemption outlined in R. C. 4905.42. The applicable portion of that statute reads, as follows:

"No company, that is both a pipe line company engaged as such in the business of transporting natural gas through pipes or tubing in interstate commerce, wholly or partly within this state, *and a natural gas company engaged as such in this state solely in the business of supplying natural gas to gas companies or to natural gas companies*, shall be required to apply to the commission for authority

to issue stocks, bonds, notes, or other evidence of indebtedness." (Emphasis added.)

Protection for investors and the consuming public is already accorded by the operation of federal securities laws and the scrutiny of the Federal Energy Regulatory Commission. Furthermore, any local interests that would be served are clearly outweighed by the enormity of the potential burden on appellant's interstate transmission of natural gas to its customers.

The commission recognized the seriousness of the problem and its constitutional ramifications but left the resolution of that issue to this court. See *East Ohio Gas Co.* v. *Pub. Util. Comm.* (1940), 137 Ohio St. 225, 239. Therefore, it is the conclusion of this court that the requirement of obtaining commission approval of the issuance of its securities contained in R. C. 4905.40 through 4905.42, as applied to this particular appellant, places an undue burden on interstate commerce in violation of the Commerce Clause of the United States Constitution.

The order of the commission is reversed.

*Order reversed.*

Leach, C. J., Cook, W. Brown, P. Brown, Sweeney and Locher, JJ., concur.

Cook, J., of the Eleventh Appellate District, sitting for Herbert, J.