This appeal presents but a single question: Whether the Northern Central Railway Company, a Maryland corporation, has the right without the permission of the Public Service Commission of Maryland to issue its capital stock to pay for the improvement and maintenance of its property.
That right, if it exists, depends upon these propositions: (1) that the Northern Central Railway Company is a carrier engaged in interstate commerce within the meaning of the Transportation Act of 1920; (2) that subsection 7, section 20a, of that act is valid, and (3) that the terms of the Transportation Act apply to the facts of this case, for if these propositions correctly state the law, it necessarily follows that the appellant was not entitled to the relief sought in its bill of complaint and that that bill was properly dismissed by the lower court.
The first question involved in any examination of those propositions is whether the appellee is a carrier engaged in interstate commerce.
The term "common carrier" as used in the Public Service Commission law of Maryland includes "all railroad corporations * * * operating transportation agencies for public use *Page 583 
in conveyance of persons or property within this State * * *." Section 413, art. 23, C.P.G.L. of Md.
The term "railroad corporation" as used in that law includes every corporation "owning, operating, managing or controlling any railroad * * *," Ibid, and the term "transportation of property or freight" includes any service in connection with "the receiving, delivering, elevation, transfer in transit, ventilation, refrigeration, icing, storage and handling of the property or freight transported." Ibid.
The term "carrier" as used in section 20a of the Transportation Act of 1920 is made by subsection 1 to mean "a common carrier by railroad (except a street, suburban, or interurban electric railway which is not operated as a part of a general steam railroad system of transportation) which is subject to this act, or any corporation organized for the purpose of engaging in transportation by railroad subject to this act." FederalStatutes Annotated, 1920, page 120. By comparing these statutes it appears that the definition of the term "carrier" found in the State statute is to some extent inconsistent with the definition of the same term given in the federal statute, in that the federal statute gives it a broader and more comprehensive meaning. For while in the Maryland statute the term as applied to a railroad corporation includes only corporations operating some agency for the conveyance of persons or property, as used in the federal statute it includes "any corporation organized for the purpose of engaging in transportation by railroad" subject to that act. But, assuming that Congress had power to extend the jurisdiction of the federal government by enlarging the meaning of "carriers" to include corporations organized for transportation by railroad as well as corporations actually engaged in that business, we are bound by the definition given in the Transportation Act, since to the extent of any inconsistency the State act must yield to the federal act.
The word "organized" as used in section 20a, subsection 1, Transportation Act, could refer either to the status of the *Page 584 
corporation at its inception or to its status at the time of some act, the validity of which depends upon whether the corporation is within the reach of the Transportation Act. Obviously it means more than mere incorporation, and contemplates that the corporation shall have taken such steps as were necessary to enable it to engage in interstate commerce whether it actually did so engage or not. Giving the language its natural grammatical effect the word "organized" is used in that statute to describe the present and existing status of the corporation and not its status or condition at some past time.
The question then is: Was the appellee when it undertook to issue the stock which is referred to in the bill a "common carrier by railroad," or organized for the purpose of engaging in transportation by railroad subject to the Transportation Act. By chapter 250 of the Acts of 1854 of the General Assembly of Maryland, the Baltimore Susquehanna Railroad Company, the York and Maryland Line Railroad Company, the York and Cumberland Railroad Company, and the Susquehanna Railroad Company, were authorized to consolidate into one corporation under the name of the "Northern Central Railway Company." The consolidated corporation was expressly authorized to issue securities to pay for completing "the road to Sunbury" in Pennsylvania, and it was expressly subjected to all the "contracts, engagements and liabilities," of the Baltimore Susquehanna Railroad Company, and all existing laws and ordinances of the State of Maryland or of the City of Baltimore affecting that company were continued in force so far as they applied to and were "consistent with the new organization of the said consolidated company."
The Baltimore Susquehanna Railroad Company was incorporated by chapter 72 of the Acts of 1827, for the construction of a railroad from the City of Baltimore to some point on the Susquehanna River. Its capital stock was fixed at one million dollars divided into shares of $50 each, of which, two thousand were to be received for subscription by *Page 585 
the State of Maryland, and two thousand by the State of Pennsylvania, and as to its capital stock, the act further provided: "And the shares of the capital stock of the said company shall be deemed and considered personal estate, and shall be exempt from the impositions of any tax or burthen, by the states assenting to this law." Acts 1827, ch. 72, sec. 20. Under the powers conferred by the Act of the General Assembly of Maryland of 1854, and an Act of the Legislature of the State of Pennsylvania of the same year, the corporations referred to therein were consolidated under the name of the Northern Central Railway Company, and the new corporation constructed or acquired railroads with the usual appurtenances in Maryland and Pennsylvania together with trackage rights on other roads, which together formed an extensive railroad system operating in and between the states of Maryland, Pennsylvania and New York. In 1914 the Northern Central Railway Company leased that entire system to the Pennsylvania Railroad Company for 999 years at an annual rental of $2,166,368. Under that lease the lessee agreed with the lessor to
 "at all times during the continuance of this lease, manage and operate the said railroads and property hereby demised, in the same manner as the lessor, as the owner thereof, is now, or shall and may at any time hereafter, be required by law to do; and observe and fully comply with the terms, conditions, and requirements of the leases and other contracts, agreements and arrangements enumerated or referred to in the granting clause of this lease; and the said lessee shall and will, at its own proper cost and expense, and without deduction from the rent aforesaid, at all times during the continuance of this lease, maintain, preserve and keep the railroads, motive power, rolling stock and equipment, and premises hereby demised, and every part of the same, in thorough repair, working order and condition, and will use and employ thereon its own motive power, rolling stock and equipment, in addition to the motive power, rolling stock and equipment of the lessor when needed for the *Page 586 
proper and efficient operation thereof, so that the business of the said demised railroads shall be preserved, encouraged and developed; and that the same shall be at all times done with safety and expedition, and the public be accommodated in respect thereto with reasonable convenience and facilities, and that all future growth of such business, as the same may occur or be reasonably anticipated, shall be duly provided for. And the lessee hereby promises and agrees to and with the lessor that the lessee shall and will, at its own proper cost and expense, and without deduction from the rent aforesaid, from time to time, when as it shall deem necessary during the continuance of this lease, do, or cause to be done, to and upon the said demised railroads, motive power, rolling stock and equipment, and premises, any and all repairs, replacements and renewals; and also, in the manner and upon the terms and conditions expressed in said Article `Fifth' of these presents, any and all additions, constructions and improvements which may be reasonably required for the purpose aforesaid." It is also agreed "that for the purpose of enabling the lessor to properly meet and discharge its obligations to the public, the lessee shall, from time to time during the continuance of this lease, make all such improvements, betterments and additions upon and to the railroads and property of the lessor hereby demised as shall be deemed necessary and shall be approved and authorized by resolution of the directors of the lessee and lessor, respectively, * * * which shall be considered substantial betterments to the demised property and so determined by the directors of the lessee and lessor, respectively, and approved and authorized by each accordingly; and the lessee shall, in the first instance, provide and furnish all moneys, material and labor required therefor, and conduct and prosecute all work connected therewith, and shall from time to time render to the lessor full and detailed statements of the cost thereof, and such cost shall constitute an indebtedness of the lessor to the lessee, which shall, *Page 587 
when and as such statements are rendered, be promptly paid by the lessor to the lessee in money, if and to such extent as, either in its treasury or otherwise, the lessor shall then have moneys available therefor and properly applicable thereto; or in case at any such times the lessor shall not have moneys available therefor, such indebtedness, or any portion thereof, not then paid in money, shall be paid and discharged by either bonds or capital stock, or both, of the lessor, as the lessee shall at the time elect and designate in writing."
And it is further provided in it that if the lessee shall at any time be in default for ninety days in the payment of rent or in the performance of any of the covenants of the lease the lessor shall have the right to re-enter and repossess the demised property, and that all rights of the lessee under the lease shall cease.
Upon these facts the appellant, contends, first, that the appellee is not a carrier, and second, that even if it is a carrier, the issuance of its stock under the circumstances of this case is not commerce. But we are unable to accept either of those contentions.
The contention that the appellee is not a carrier is based upon the theory that, since under the lease the actual work of transporting persons and property is performed by the lessee, that the lessor has lost its status as a carrier. But we think that contention involves too narrow a construction of the word carrier. For while the lessee does perform the actual work of transportation over the leased system of railroads, the lessor still has important duties and functions to perform in connection with that transportation, in which the public has a vital and immediate interest and which are necessarily predicated upon and assume its continued status as a carrier. Under the terms of the lease it has the right, and under the laws of the State it is charged with the duty, of requiring the lessee to maintain the leased property in such a condition as may be necessary to enable it to render adequate *Page 588 
and efficient service to the public, and also to require that the lessee during the continuance of the lease manage and operate the leased property in the same manner as the lessor "is now or shall and may at any time hereafter, be required by law to do." And under the lease it is empowered to authorize "improvements, betterments and additions" to the leased property; for the purpose of augmenting its capacity to adequately discharge "its obligations to the public," and to pay for such improvements, betterments and additions from its funds, or by issuing its stock or bonds. These are active and important duties, which are peculiarly and exclusively incident to the appellee's status as a common carrier, and which could properly belong to no other status whatever, because the public service which by its charter the appellee is to render is the operation and maintenance of a railroad, and all its obligations to the public are connected with that service. It was originally chartered as a carrier, it was organized as a carrier, until the lease referred to, it operated a railroad system as a carrier, it is still required to discharge many duties as a carrier, it is now organized to act as a carrier, and in the event of default on the part of its lessee, it must again actively operate its railroad system as a carrier. Under those circumstances it remains now as it originally was a common carrier.
But, assuming that it is a carrier, it is contended that issuing its securities to pay for improvements to its system is not "commerce," and that therefore such an act is not affected by the Federal Transportation Act of 1920. But the question of whether railroad transportation between the several states is commerce, and the appellant's contention amounts to that, is no longer open. And yet the operation and the right to raise money to operate are parts of the same thing, and the operation of a railroad or other system of transportation and the right to raise money for such operation, are inseparable. Funds in the very nature of things are the life blood of a corporation. If it cannot secure funds through the sale of its stock or securities, it cannot function. *Page 589 
and certainly the Legislature never contemplated that when Congress was granted the power to "regulate commerce" among the several states, it was given the power only to regulate the operation of the physical instrumentalities employed in transportation, but was not granted the power to regulate the issuance of securities by the agencies engaged in that service to raise funds, without which it could not be rendered. And if the commerce clause is broad enough to include transportation, it is broad enough to include the means through which alone transportation can be furnished.
It is urged however, that if the State could, prior to the Transportation Act of 1920, "constitutionally require the railroad company to secure its consent to a stock issue, it could only do so because there was in this no interference with or regulation of interstate commerce." But we cannot agree with that argument. For while Congress had the power to regulate the issuance of securities prior to that act, the power was dormant, and until it was exercised the State could, so long as it did not hinder or interfere with the operation of the service of the corporation as an interstate carrier, regulate and control the issuance of its securities, and the test of the State's power was whether its exercise in any given case interfered with or hindered interstate commerce. But when Congress did exercise the power, and by appropriate legislation placed the right to regulate and control the issuance of such securities in a federal agency, the power of the State to regulate and control the issuance of securities by an interstate carrier ceased. This conclusion is, we think, supported by the Supreme Court in a series of cases beginning with Wilson v. Blackbird Creek Co.,
2 Pet. 245, and concluding with Bowman v. R.R. Co.,125 U.S. 465, which are analyzed and compared in Professor Willoughby's work on the Constitution, sec. 304. In the case first cited, the State of Delaware had authorized the construction of a dam across a navigable creek. That act was attacked as a violation of the commerce clause, but in denying that contention Chief Justice Marshall said: "If Congress had passed any act *Page 590 
which bore upon the case, any act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks * * * we should feel not much difficulty in saying that a State law coming in conflict with such act would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several states; a power which has not been so exercised as to affect the question." In Cooley v. Port Wardens, 12 How. 299, in reference to the same question, it is said: "The grant of commercial power to Congress does not contain any terms which expressly exclude the states from exercising an authority over its subject matter. If they are excluded it must be because the nature of the power, thus granted to Congress, requires that a similar authority should not exist in the states. If it were conceded on the one side, that the nature of this power, like that to legislate for the District of Columbia, is absolutely and totally repugnant to the existence of similar power in the states, probably no one would deny that the grant of the power to Congress, as effectually and perfectly excludes the states from all future legislation on the subject, as if express words had been used to exclude them. And on the other hand, if it were admitted that the existence of this power in Congress, like the power of taxation, is compatible with the existence of a similar power in the states, then it would be in conformity with the contemporary exposition of the Constitution (Federalist, No. 32), and with the judicial construction, given from time to time by this Court, after the most deliberate consideration, to hold that the mere grant of such a power to Congress did not imply a prohibition on the states to exercise the same power; that it is not the mere existence of such a power, but its exercise by Congress, which may be incompatible with the exercise of the same power by the states, and that the states may legislate in the absence of congressional regulations. (Sturges v.Crowninshield, 4 Wheat. 193; Moore v. Houston, *Page 591 
5 Wheat. 1; Wilson v. Blackbird Creek Marsh Co., 2 Peters, 251.)" And in Bowman v. R.R. Co., 125 U.S. 465, the principle was stated in this language: "The question, therefore, may be still considered in each case as it arises, whether the fact that Congress has failed in the particular instance to provide by law a regulation of commerce among the states is conclusive of its intention that the subject shall be free from all positive regulation, or that, until it positively interferes, such commerce may be left to be freely dealt with by the respective states." Running through and connecting all the cases in which the Supreme Court has considered the question, is this underlying and controlling principle, that where the act under consideration is of such a character that it may be general in its application to a subject which demands uniformity of regulation, that the power of Congress to act is exclusive, and that the states may not legislate upon that subject whether Congress has acted or not, but that where no such uniformity of treatment is required, the states may legislate until Congress has acted.
Applying that principle to such facts as those involved in this case, the conclusion seems to be justified that until Congress through the Transportation Act of 1920 assumed the right to regulate the issuance of securities by carriers engaged in interstate commerce, the states could exercise that power within the limits stated above. The transportation business of the country is carried on by a great number of corporations, varying widely in their resources, their liabilities, their necessities, their earning capacity, and their duties, all of which may be affected by local conditions. The value of their securities must naturally be affected to some extent by all of these elements which could properly be considered by agencies, local to the corporation issuing securities, and until Congress did act there was no reason why the several states should not have exercised the power of regulating the issuance of such securities by corporations respectively created by them, even though engaged at the time in interstate commerce, so long as their regulation did not interfere *Page 592 
with the performance of their duties as such carriers. That such seems to have been the view of the federal government is at least indicated by the fact that for much more than a century after the adoption of the commerce clause Congress passed no legislation for regulating the issuance of securities by corporations engaged in interstate commerce, although during that period the states in countless instances did legislate upon that subject. That some regulation by some power was desirable and necessary is scarcely a matter for argument, and that in the absence of federal legislation it was proper for the State to regulate and control the issuance of securities within the limit stated, seems quite as clear.
The second proposition is that subsection 7, section 20a, of the Transportation Act of 1920 is valid. The appellant's contention is that if that act divests the State commission of its authority over the stock issues of a Maryland corporation under the circumstances of this case, that it is an "unconstitutional invasion by the federal government into the governmental sphere reserved to the states." And much of the very careful and able argument of counsel for the State was devoted to an exposition of various evil consequences which may flow from the grant of any such power to the federal government, but as that is a political and legislative and not a judicial question, we will not refer to it further than to say this: that whatever the consequences following that act may be, whether beneficial or injurious, they must be dealt with by the legislative branch of the government, and so long as that legislature acts within its constitutional powers the wisdom of its acts cannot be reviewed by the courts.
Nor do we feel called upon to consider the suggestion that the Interstate Commerce Commission may, if that legislation is valid, authorize a corporation to issue capital stock in excess of the amount authorized by the state which created it. That question is not involved in this case, since it is not suggested by anything in the record that the issue of stock under consideration here is in excess of the amount which the corporation *Page 593 
is allowed by its charter to issue and we will not consider it.
The contention that the provision in question is an unconstitutional invasion of the sovereign power of the state, necessarily rests upon the assumption that the state never granted to the federal government the right to regulate stock issues by corporations created by it. But if the issuance of securities by an interstate carrier is interstate commerce, which we have decided, and if the state granted to the federal government the right to regulate interstate commerce among the states, as it has done, there is no force in that contention either. For there can be no invasion of the sovereign power of the state through the exercise of a power which it voluntarily surrendered and granted to the federal government.
The fact that by that provision the state is deprived of its power to regulate the issuance of securities by a corporation which it itself incorporated constitutes no invasion of its sovereignty, because it consented to that deprivation when it assented to the commerce clause. When that assent was given, it was necessarily contemplated that the grant of power to regulate commerce included all incidental and implied powers necessary to make that grant effective, and there is no more reason to hold that the right of the corporation to issue securities was beyond that grant than was its right to exercise any other corporate function or duty which are conceded to be in it. And the necessity for its inclusion has been demonstrated and illustrated by the history of transportation in this country in recent years. If each state had the unrestricted power to control the issuance of securities by interstate carriers, then any one of the several states could have the power to some extent to interfere with, cripple or hinder the commerce of the entire country, by refusing to permit such parts or links of transportation systems as operated within their respective borders through corporations chartered by such states respectively to secure funds to enable them to adequately discharge their duties as interstate *Page 594 
carriers, and so to interfere with the efficient operation of the whole system upon which the industrial, commercial and social life of the whole country so largely depends. We think therefore, that the statute under consideration is within the meaning of the commerce clause of the Federal Constitution and is valid.
The third proposition is that it is applicable to the facts of this case, and in view of what has already been said we have no doubt that it is. Subsection 2 of section 20a makes it unlawful for an interstate carrier to issue any stocks, bonds or other securities even when authorized by the "authority creating" the corporation, until authorized by the Interstate Commerce Commission, while section 7 relieves the corporation of the necessity of securing the consent of the state of its creation to such issue. There is no necessary conflict in these provisions. It could not have been intended by section 2 to give to the authority creating the corporation engaged in interstate transportation the absolute power to veto a proposed issue of securities by it, because that would have been to confer upon the several states powers which they did not then have, and which Congress could not grant to them, and because it is the obvious intention of the act to extend and not to restrict federal control over issuance of securities by interstate carriers. The two sections together mean, what in clear terms they say, that the assent of the authority creating an interstate carrier, to the issuance of securities by it, is nugatory and ineffective, and will not in itself authorize such issue and therefore may be dispensed with.
For these reasons we entirely concur in the conclusion reached by the learned court below and will affirm the decree appealed from.
Decree affirmed, with costs. *Page 595