STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION
v. SOUTHERN BELL TELEPHONE AND TELEGRAPH COM-
PANY

No. 7410UC93

(Filed 21 August 1974)

1. Utilities Commission § 2— approval of utility's securities — application
of statutes — multi-state foreign corporation

Article 8 of G.S. Ch. 62 relating to the regulation of the securities
of a public utility applies to a multi-state foreign corporation  engaged
in interstate commerce.

2. Utilities Commission § 2— authority over foreign corporations

The mere fact that a public utility otherwise subject to the juris-
diction of this State is a foreign corporation does not deprive this
State of all supervisory and regulatory powers over securities issued
by such a corporation. G.S. 55-132(a).

3. Constitutional Law § 27; Telephone and Telegraph Companies § 1;
Utilities Commission § 2— approval of issuance of securities — burden
on interstate commerce

Statutes and Utilities Commission rules adopted pursuant thereto
requiring a public utility to obtain Commission approval before issu-
ing any securities impose an undue burden on interstate commerce in
violation of Art. I, Sec. 8, of the U. S. Constitution when applied to
Southern Bell Telephone and Telegraph Company, a utility which
furnishes intrastate and interstate telephone service to customers in
four states, which has less than 18% of its telephones and invested
capital located in this State, and which derives from its interstate
operations more than 30% of the operating revenues it receives from
providing communications services. Art. 8 of G.S. Ch. 62.

APPEAL by Southern Bell Telephone and Telegraph Com-
pany from order dated 12 June 1973 entered by the North Car-
olina Utilities Commission in Docket No. P-55, Sub. 728.

Southern Bell Telephone and Telegraph Company (Southern
Bell), a New York corporation which is a subsidiary of Ameri-
can Telephone and Telegraph Company (AT&T), is the member
of the Bell system which furnishes intrastate, and interstate tele-
phone and related service to customers in North Carolina, South
Carolina, Georgia and Florida. In addition, through interconnec-
tion of its facilities, it contributes to providing telephone service
throughout the United States and other parts of the world. By
letter dated 4 January 1973 the North Carolina Utilities Com-
mission (Commission) called upon Southern Bell to comply
with Article 8 of G.S. Ch. 62 and with Commission rules adopted
pursuant to that Article by applying for and obtaining prior

Commission approval before issuing any securities. This request marked a change in Commission policy toward Southern Bell. The matter had been the subject of Commission inquiry as early as 1939, at which time the Commission determined that its prior approval of Southern Bell's securities issues should not be required. The Commission reexamined the question in 1956 and 1957, following which the Commission by letter dated 20 June 1957 informed Southern Bell that the Commission was satisfied that it did not have jurisdiction over sale of stock and issuance of securities by Southern Bell, since it was a foreign corporation subject to the regulatory authority of New York, the State of its incorporation. No change was made in this position until the Commission's letter to Southern Bell of 4 January 1973.

Southern Bell responded to the Commission's 4 January 1973 letter by letter to the Commission dated 22 January 1973 in which it requested that the Commission letter of 20 June 1957 be continued in operation, or in lieu thereof that it be continued on an interim basis as to a pending $300,000,000.00 Southern Bell bond issue and that Southern Bell be given opportunity to be heard as to a further continuation of the 20 June 1957 letter. Based on Southern Bell's prior reliance on the 1957 exemption letter and on the potentially adverse effect which delay caused by filing might have upon the pending bond issue, the Commission allowed the exemption letter of 20 June 1957 to remain in effect on an interim basis, but notified Southern Bell that further continuation of the exemption would be reviewed by the Commission as a formal docket and set the matter for hearing.

Following hearing, the Commission issued its order dated 12 June 1973 directing Southern Bell, from and after the date of the order, to comply in all respects with the provisions of Article 8 of G.S. Ch. 62 relating to regulation of securities and with the Commission's Rules adopted pursuant to its authority under G.S. Ch. 62. Subsequently, after Southern Bell filed exceptions and notice of appeal, the Commission by order dated 8 August 1973 postponed the effective date of its 12 June 1973 order pending judicial review.

*Commission Attorney Edward B. Hipp and Associate Commission Attorney E. Gregory Stott for the North Carolina Utilities Commission.*

*Joyner & Howison by R. C. Howison, Jr.; and Moore & Van Allen by James O. Moore for Southern Bell Telephone and Telegraph Company, appellant.*

PARKER, Judge.

Article 8 of Chapter 62 of the General Statutes, G.S. 62-160 through G.S. 62-171, entitled "Securities Regulation," provides in general for supervision by the North Carolina Utilities Commission over issuance of securities by a public utility. Specifically, G.S. 62-161(a) provides:

> "No public utility shall issue any securities . . . unless and until, and then only to the extent that, upon application by such utility, and after investigation by the Commission of the purposes and uses of the proposed issue, and the proceeds thereof . . . the Commission by order authorizes such issue. . . . "

The word "securities" is broadly defined by the Public Utilities Act to mean "stock, stock certificates, bonds, notes, debentures, or other evidences of ownership or of indebtedness, and any assumption or guarantee thereof." G.S. 62-3(26). The question presented by this appeal is whether the Commission may lawfully require Southern Bell to comply with the provisions of Article 8 and issue securities in the future only after first making application to and obtaining an order from the Commission authorizing such issue. We hold that it may not.

[1] At the outset, we reject Southern Bell's argument that Article 8, "properly construed, is not applicable to a multi-state foreign corporation engaged in interstate commerce." We find nothing in the language of Article 8 or of the Public Utilities Act generally to support this contention. On the contrary, Article 8 throughout refers to public utilities in general, and the Act defines a "public utility" to mean "a person, whether organized under the laws of this State or under the laws of any other state or country, now or hereafter owning or operating in this State equipment or facilities for: . . . 6. Conveying or transmitting messages or communications by telephone or telegraph, or any other means of transmission, where such service is offered to the public for compensation." G.S. 62-3(23)a.6. The

word "person" includes a corporation. G.S. 62-3(21). Thus, the broad language employed by the Legislature in Article 8 and in other portions of the Public Utility Act clearly brings Southern Bell within its scope. Any doubt that this was the legislative intention is removed by reference to G.S. 62-171, which makes provision for agreements by the Commission with the commission or other regulatory agency of another state "on the issue of stocks, bonds, notes or other evidences of indebtedness by a public utility owning or operating a public utility both in such state and in this State." To construe Article 8 as Southern Bell contends would render G.S. 62-171 meaningless.

[2]   We also reject the idea, which apparently was the rationale for the Commission's 20 June 1957 order, that the mere fact that a public utility otherwise subject to the jurisdiction of this State is a foreign corporation somehow deprives this State of all supervisory and regulatory powers over securities issued by such a corporation. G.S. 55-132(a) provides that a foreign corporation holding a certificate of authority to transact business in this State shall "enjoy the same, but not greater, rights and privileges as a domestic corporation organized for the purposes set forth in the application pursuant to which such certificate of authority is issued," and we see no reason why this statute should not be given full effect. In Annotation, "Statutory requirements respecting issuance of corporate stock as applicable to foreign corporation," 8 A.L.R. 2d 1185, at page 1187, we find:

> "A state, acting through its legislature, in a proper case, and subject only to the limitations of the Federal and state constitutions, has the power to control and regulate domestic and foreign corporations equally, in so far as they operate within the state, including issuances of corporate stock, and can determine the legal effect of such operations."

This brings us to the question whether constitutional limitations apply under the factual situation presented by this case to prevent the Commission from enforcing the provisions of Article 8 against Southern Bell. We hold that they do.

In the order appealed from the Commission failed to make detailed findings of fact. The facts, however, are not in dispute, and by Addendum to the Record, the parties have stipulated and

agreed to certain facts, including the following which we deem to be particularly pertinent:

On 31 December 1972 Southern Bell had approximately 8,282,000 telephones in service. Of these, approximately 3,402,000 were in Florida, 2,414,000 in Georgia, 1,008,000 in South Carolina, and 1,458,000 in North Carolina. More than 30% of Southern Bell's operating revenues from provision of communication services in the four states is attributable to its interstate operations. On 31 December 1972 Southern Bell's total investment in telephone plants amounted to $4,740,000,-000.00. Of this, $1,997,000,000.00 was invested in Florida, $1,361,-000,000.00 was invested in Georgia, $562,000,000.00 was invested in South Carolina, and $820,000,000.00 was invested in North Carolina. From 31 December 1967 to 31 December 1972 Southern Bell's total investment in telephone plant increased from about $2,495,000,000.00 to about $4,740,000,000.00 and annual construction expenditures increased from approximately $352,000,-000.00 in 1968 to $819,000,000.00 in 1972. Less than half of the dollars needed to support this construction program came from internal sources such as depreciation funds and retained earnings. The remainder came from external sources. Of the $819,-000,000.00 expended in 1972, $250,000,000.00 came from the sale of debentures and $210,000,000.00 from additional equity investment by AT&T, Southern Bell's parent. Within the past five years, Southern Bell has issued and sold long-term debentures and/or intermediate-term notes to the public in the aggregate principal amount of $1,075,000,000.00. During this period AT&T made additional equity investments in Southern Bell in the total amount of $697,000,000.00. Because of ever-increasing construction program demands, it has been and will continue to be necessary for Southern Bell to obtain large sums of new capital from external financing to supplement its internally generated funds. Southern Bell obtains the external financing which it needs on a day-to-day basis by means of short-term borrowings. The sources for these borrowings are the sale of commercial paper, advances from AT&T, and bank loans. Short-term (less than two years) notes are issued almost daily, and in 1972 borrowings of this type were made by Southern Bell on all but six working days. There are limits to the amount of short-term debt which Southern Bell may incur, and when these limits are reached, the short-term debt must be repaid with the proceeds from some form of permanent financing. Such financing involves additional equity investments by AT&T or the issuance

and sale to other investors of long-term or intermediate-term debt or a combination of both. Timing of debt issues is all important in that the operational and financial needs of the Company must be reconciled to the atmosphere of the market. The market conditions remain relevant until the last possible moment, when decisions must be made with respect to whether the issue will be long-term debt, intermediate-term debt, or a combination of both, and with respect to whether the sales should be by competitive bidding or negotiated. Since Southern Bell operates a multi-state business, its financing must be governed by the needs and objectives of the Company as a whole, and its securities are rated on the basis of its total performance and overall financial good health. Thus, when the Company issues securities, it is a single and indivisible act on its part whereby it pledges the good faith and credit of the entire Company. The proceeds of Southern Bell's securities issues are utilized for its corporate needs in all states in which it operates.

None of the other states in which Southern Bell operates requires approval of its securities issues. Florida and South Carolina have no statutory provision governing regulation by those states' utilities commissions of the issuance of securities by telephone companies. The State of Georgia has a statute which requires companies subject to the jurisdiction of the Georgia Public Service Commission to obtain approval of securities issues. However, that Commission has issued an order declaring itself to be without jurisdiction of the issuance of stocks, bonds or other evidences of indebtedness by Southern Bell. In the past five years one securities issue has been made each year. Each one of those was subject to the Securities and Exchange Commission (SEC) requirements of registration statement. The registration statement is filed with the Securities and Exchange Commission approximately three weeks before the actual issue. Southern Bell is not required to obtain prior approval from the New York State Commission, but is required to furnish them with a monthly report of all financing, including short-term and long-term, for their review at the end of each month. At the present time the only agency which exercises any sort of prior approval of Southern Bell's financing is the SEC.

[3] Upon the stipulated facts no question has been or can be raised but that Southern Bell is directly and substantially involved in interstate commerce. More than 30% of its operating revenues from providing communications services is derived

from its interstate operations, and the same equipment which carries its local messages is also used in carrying its interstate messages. It has long been settled, of course, that providing interstate communications is engaging in interstate commerce within the meaning of the Commerce Clause, Art. I, Sec. 8, of the Federal Constitution, *Pensacola Tel. Co. v. Western Union Tel. Co.*, 96 U.S. 1, 24 L.Ed. 708, and a very substantial part of Southern Bell's activities involve transmission of messages interstate and with foreign countries. The question presented by this appeal, therefore, is whether the regulation and control by this State over the issuance of securities by Southern Bell, which the attempted enforcement by the Commission of G.S. Chap. 62, Art. 8, would necessarily entail, would impose such an undue burden on interstate commerce as to make such regulation and control constitutionally beyond the State's power to enforce. We hold that it would.

Under the stipulated facts there can be no question that Southern Bell's continued capability to provide facilities adequate for its ever-growing business, including its interstate business, is directly dependent upon its continuing issuance of securities. It is apparent that at least for the foreseeable future a very large portion of the tremendous volume of capital funds required simply cannot be raised in any other way. Therefore, State regulation and control over issuance of these securities will necessarily involve a large degree of State regulation and control over Southern Bell's ability to carry on its interstate activities. It is true, of course, that absent Federal regulation a state may validly regulate matters of local concern even though to do so may involve some impact upon interstate commerce. In such case, however, the regulation must be one which safeguards some obvious state interest, and the local interest involved must outweigh the national interest in maintaining the free flow of commerce and its freedom from local restraints in matters requiring uniformity of regulation. *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915. Here, there has been no showing that the legitimate local interest which this State has to regulate Southern Bell's intrastate services and rates would be in any way impaired by denying to the State the power to regulate and control Southern Bell's issuance of securities. The Commission has never heretofore exercised this power and nothing in the record suggests that it has thereby been hampered in performing its statutory duties over intrastate rates and services. Capital raised by issuance of securities in any event

does not become part of the rate base until it has been invested in property "used and useful in providing the service rendered to the public within this State," G.S. 62-133(b)(1), and then only to the extent of the fair value of such property. Further, "[t]he choice of the appropriate debt-equity ratio is a management decision, but the board of directors may not thereby tie the hands of the Commission and compel it to approve rates for service higher than would be appropriate for a reasonably balanced capital structure." *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 341, 189 S.E. 2d 705, 720.

The issuance of a security by Southern Bell is a single, indivisible act. While the proceeds may be invested in one state or another as Southern Bell's management may from time to time decide, the issuance of the security cannot be so allocated. Therefore, should the North Carolina Commission exercise its asserted power to prevent Southern Bell from issuing any security without first obtaining the Commission's approval, the inevitable consequence would be that the Commission would be required to inquire into and pass upon the needs of Southern Bell and its customers in Florida, Georgia and South Carolina, matters which are clearly beyond the Commission's lawful authority. If the North Carolina Commission can lawfully regulate issuance of securities by Southern Bell when less than 18% of its telephone and invested capital are located in this State, then the Commission of each of the other states in which Southern Bell does business may likewise exercise such power. The possibility of conflict in an area where uniformity of regulation is essential becomes apparent.

The agreed statement of facts contains a stipulation that "[s]everal other AT&T subsidiary companies are required to seek prior approval of their respective state commission. . . . There are no known chaotic service circumstances caused by the requirement that any of these companies obtain prior approval of their financing, but none of the securities issues have ever been disapproved or modified. It is a perfunctory type operation from the beginning to the end and there is never any doubt as to the approval of the commission. Therefore, it does not cause many problems." Whatever the experience of other utility companies before other state regulatory bodies may have been, we cannot assume that the North Carolina Commission, should its asserted power to regulate issuance of Southern Bell's securities be upheld, would so lightly regard its statutory duties as to

perform them in "a perfunctory type operation from the beginning to the end." More importantly, the cases reject the view that constitutional limitations on the powers of a state over interstate commerce can come into effect only after there is an actual attempt at multiple regulation or an actual obstruction of commerce. On the contrary, the cases demonstrate that "the possibility of conflict or dual regulation, may be sufficient to curtail powers sought to be asserted by an individual state over interstate commerce where such commerce might be impeded by conflicting and varying regulation." *United Air Lines, Inc. v. Illinois Commerce Commission,* 32 Ill. 2d 516, 207 N.E. 2d 433.

[3]   On the stipulated facts, we find such legitimate local interests as might be protected by upholding the Commission's power to regulate issuance of Southern Bell's securities to be only minimally and incidentally involved. At the same time, these facts make manifest that sustaining such state regulatory power raises a substantial possibility of impeding the free flow of interstate commerce. Weighing the relative state and national interests involved, we find that sustaining the asserted State regulatory power as to Southern Bell would impose an undue burden on interstate commerce in contravention of the Federal Constitution. While such a balancing of state and national interests necessarily requires a close appraisal of the varying factual situations presented in each case, our decision here finds support in the decisions in *United Air Lines, Inc. v. Illinois Commerce Commission, supra,* and in *Application of United Air Lines, Inc.,* 172 Neb. 784, 112 N.W. 2d 414.

The order appealed from is

Reversed.

Judges BRITT and VAUGHN concur.