STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION v. SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY

No. 93

(Filed 27 August 1975)

1. Utilities Commission § 2— approval of utility's securities — application of statutes — foreign corporation in interstate commerce

Article 8 of G.S. Ch. 62 relating to the regulation of the securities of public utilities applies to all public utilities doing business in this State whether they be foreign or domestic corporations and even though they are also engaged in interstate commerce.

2. Constitutional Law § 27; Telephone and Telegraph Companies § 1— telecommunications — interstate commerce

The business of conducting telecommunications between persons in different states constitutes interstate commerce subject to the regulation of Congress.

3. Constitutional Law § 27; Telephone and Telegraph Companies § 1; Utilities Commission § 2— approval of issuance of securities — burden on interstate commerce

Statutes and Utilities Commission rule adopted pursuant thereto requiring a public utility to obtain Commission approval before issuing any securities impose an undue burden on interstate commerce in violation of Art. I, § 8, of the U. S. Constitution when applied to Southern Bell Telephone and Telegraph Company, a utility which furnishes intrastate and interstate telephone service to customers in four states, which has 17% of its investment in telephone plants and 18% of its telephones in service in North Carolina, which derives from its interstate operations more than 30% of the operating revenues it receives from providing communications services, which made short term borrowings in all but six working days during 1972, and which has made one securities issue of long term and intermediate term debt each year for the past five years. Art. 8 of G.S. Ch. 62.

Justices COPELAND and EXUM did not participate in the hearing or decision of this case.

ON *certiorari* to review the decision of the Court of Appeals reported in 22 N.C. App. 714, 207 S.E. 2d 771 (1974), which reversed an order entered by the North Carolina Utilities Com-

mission on 12 June 1973 in Docket No. P-55, Sub. 728, docketed and argued in the Supreme Court at the Fall Term 1974 as Case No. 122.

This case had its inception in a letter dated 4 January 1973 in which the North Carolina Utilities Commission (Commission) directed Southern Bell Telephone and Telegraph Company (Southern Bell) to comply with N. C. Gen. Stats. Ch. 62, Art. 8 and Commisison's Rule R1-16 (adopted pursuant to Art. 8) by applying for and obtaining the Commission's approval before issuing any securities. Chapter 62 is the "Public Utilities Act of 1963." Article 8 governs "Security Regulations." As defined by the Act, " 'Securities' means stock, stock certificates, bonds, notes, debentures or other evidences of ownership or indebtedness, and any assumption or guaranty thereof." G.S. 62-3(26).

Southern Bell, a wholly owned subsidiary of American Telephone and Telegraph Company (A.T. & T.) is a New York corporation furnishing intrastate, interstate, and foreign telecommunication services to customers in North Carolina, South Carolina, Georgia, and Florida. The mandate in the Commission's letter reversed its 34-year policy toward Southern Bell. In 1939 the Commission had determined that its prior approval of Southern Bell securities should not be required. In 1956 and 1957 it re-examined this position. On 13 August 1956 the Commission wrote Southern Bell it had decided it would "not now claim or assert jurisdiction" over the sale of its securities. On 20 June 1957 it notified Southern Bell it had concluded that it had no jurisdiction over the issuance of securities by Southern Bell, "which is a New York corporation and subject to the regulatory authority of the State of New York." Until 4 January 1973 the 1957 "exemption letter" remained in effect.

At the time Southern Bell received the letter of 4 January 1973, it had pending a $350,000,000 bond issue, which had been scheduled for marketing. The delay incident to securing Commission approval of these securities by compliance with G.S. Ch. 62 and Commission's Rule R1-16 would have seriously jeopardized marketing prospects for the issue and interest rates then available. The Commission, therefore, granted Southern Bell's request to exempt this bond issue from the directive. It also agreed to continue the 1957 exemption letter in force pending its reconsideration at a formal hearing which was scheduled and held on 17 April 1973. Southern Bell was notified that at this hearing it had the burden of establishing (1) "the current status

of the filing of securities of foreign corporation utility companies" with the Commission, and (2) of showing cause why G.S. 62-160 *et seq.* should not be applicable to it.

At the hearing Southern Bell introduced the 1957 exemption letter and other 1956-57 correspondence between it and the Commission. In compliance with the Commission's order to produce as a witness "a responsible financial officer of the company," at the hearing Southern Bell examined its vice-president, treasurer, and chief financial officer, who was cross-examined by the Commission's attorney. No other evidence or witnesses were offered.

The facts relevant to the decision of this case are uncontradicted. As set out above and briefly summarized below they were stipulated by the parties on 28 February 1974, because the Commission's order, which is the subject of this appeal, did not detail them.

On 31 December 1972 Southern Bell had approximately 8,282,000 telephones in service. Of these, approximately 3,402,000 were located in Florida; 2,414,000 in Georgia; 1,008,000 in South Carolina; and 1,458,000 in North Carolina. On each business day of 1972 Southern Bell averaged 2,045,000 toll messages; of these, 903,000 were interstate messages. More than 30% of Southern Bell's operating revenues from communication services in the four states is attributable to its interstate operations. Between 31 December 1967 and 31 December 1972 Southern Bell's total investment in telephone plants increased from about $2,495,000,000 to about $4,740,000,000. Of this total $1,997,000,000 was invested in Florida; $1,361,000,000 in Georgia; $820,000,000 in North Carolina; and $562,000,000, in South Carolina.

To meet the continuously increasing demand for quality telephone service in the five years between 1967 and 1972, Southern Bell's total investment in telephone plants increased $2,245,000,000. Annual construction expenditures increased from approximately $352,000,000 in 1968 to approximately $819,-000,000 in 1972. Construction expenditures for 1973 were expected to be about $1,030,000,000. Less than half the funds for this construction program came from internal service such as depreciation funds and retained earnings. The remainder came from the sale of debentures and additional equity investment by A.T. & T. Within the past five years Southern Bell has issued and sold long-term debentures and intermediate-term

notes totaling $1,075,000,000, and A.T. & T. made additional equity investments in Southern Bell of $697,000,000.

Southern Bell's ever-increasing construction program will continue to require it to obtain large sums of new capital from external financing on a day-to-day basis by means of short-term borrowings of less than two years. The sources of such borrowings are the sale of commercial paper, advances from A.T. & T., and bank loans. Southern Bell made short-term borrowings on all but six working days of 1972. When the limits to the amount of short-term debt which Southern Bell may incur are reached, the short-term debt must be repaid with the proceeds of permanent financing. Such financing must come from additional equity investment by A.T. & T., the issuance and sale of long-term or intermediate-term commercial paper, or both. The decision is made on the basis of a close evaluation of the total construction necessary to serve all the company's customers, the amount of money required, the company's total financial picture, its current capital structure and how it should properly be altered, the relative cost of debt and equity issues, the ratio of earnings to fixed charges, overall market conditions, and trends in interest rates.

When a decision to issue debt is made, management must consider not only the factors which will enable it to market the new issue on favorable terms; it must also coordinate the terms and maturity dates of the new issue with existing debt. It must decide whether the borrowings will be long-term, intermediate-term, or both, and whether competitive bidding by underwriters or a negotiated sale would be more advantageous to the company. In all these decisions, market conditions are prime considerations and timing in this regard is all important, for the company's options must be kept open as long as possible in an effort to minimize interest costs.

Since Southern Bell operates a multi-state communications business, its financing is governed by the needs and objectives of the company as a whole. When securities are issued, the company's total net income and entire credit is pledged, and the proceeds are used for its corporate needs in all four states in which it operates. In the past five years one securities issue has been made each year.

The regulatory provisions of the Securities Act of 1933 apply to Southern Bell. It is required to file with the Securities

---

**Utilities Comm. v. Telegraph Co.**

---

and Exchange Commission (SEC), prior to public offerings of new securities, information relevant to the securities to be sold, the application of the proceeds thereof, a certified statement showing the financial position of the Company and much other information relevant to the construction expenditures and capitalization of the Company, its organization and business operations. A the present time SEC is the only agency which exercises any sort of prior approval of Southern Bell's financing. Compliance with the requirements of the Federal Securities Act offers ample protection to investors. None of Southern Bell's securities issues have ever been disapproved by the SEC.

Southern Bell is a public utility subject to the jurisdiction of the New York Public Service Commission. As such, each month it is required to file with that Commission a detailed report of the issuance of stock, bonds, notes or other evidence of indebtedness and the circumstances under which all such securities were issued. Much of the information required by Commission's Rule R1-16 would duplicate the data Southern Bell files with SEC and the New York Public Service Commission.

Southern Bell is also subject to regulation by the Federal Communications Commission (FCC) since a substantial part of the Company's revenue comes from interstate communications services. The FCC prescribes a uniform system of accounts which is applicable to Southern Bell. It establishes depreciation rates and standard procedures for separating property costs, revenues, expenses, taxes and reserves between interstate and intrastate services.

In addition to regulation by the SEC, the FCC, and the New York., Public Service Commission, Southern Bell's intrastate rates, services, and other matters are subject to regulation and continued surveillances by the Utility Commissions of the four states in which it operates.

Neither of the other three states in which Southern Bell operates requires approval of its securities issues. Florida and South Carolina have no statutory provisions governing the issues of securities by telephone companies. Georgia has a statute which requires all companies subject to the jurisdiction of the Georgia Public Service Commission to obtain prior approval for securities issues, but that Commission had ruled itself without jurisdiction over the issuance of securities by Southern

Bell. Other multi-state companies which are A.T. & T. subsidaries, including the New England Company, the Southwestern Company, and the Northwestern Company, are required to seek prior approval of their respective states' commissions for their financing. To date this requirement has caused no problems because no securities issues have ever been disapproved or modified. "It is a perfunctory type operation from the beginning to the end."

Compliance with G.S. 62-160 and Rule R1-16 would require Southern Bell to notify the Commission within 10 days of the issuance of any notes with a maturity date of not more than two years. Because of the necessity for day-to-day financing compliance would require daily reports to be filed with the Commission. Southern Bell initiates its permanent financing after having geared its borrowing for some months to a particular date so that all of its short-term debts will be maturing roughly at the same time.

By an order entered on 12 June 1973, the Commission ruled that Article 8 (G.S. 62-160 to 62-171) made no exception for foreign corporations doing business in North Carolina, and that the Commission had "no basis in law or in fact" to further excuse Southern Bell from complying with its provisions and Commission rules adopted to implement them. Whereupon, it ordered that from and after 12 June 1973, Southern Bell would be required to comply fully with the provisions of Article 8 with reference to the issuance of its securities. To this order Southern Bell filed numerous exceptions and appealed to the Court of Appeals. Pursuant to G.S. 62-95, and for good cause shown, the Commission postponed the effective date of the order pending judicial review.

In the Court of Appeals, Southern Bell argued, *inter alia,* that (1) N. C. Gen. Stats., Ch. 62, Art. 8, "properly construed" is not applicable to Southern Bell, a foreign corporation operating a telecommunications business in intrastate and interstate commerce in North Carolina; and (2) even if Article 8 does purport to require Southern Bell to secure prior approval from the Commission before issuing and marketing its securities, such application would impose an unreasonable restraint upon interstate commerce in violation of U. S. Const., art. I, § 8, cl. 3 (the Commerce Clause).

The Court of Appeals rejected Southern Bell's first argument and sustained the second. Holding that "the asserted State

---

Utilities Comm. v. Telegraph Co.

---

regulatory power as to Southern Bell would impose an undue burden on interstate commerce in contravention of the Federal Constitution," the Court of Appeals reversed the Commission's order 12 June 1973 from which Southern Bell had appealed. Upon the Commission's petition we allowed certiorari.

*Edward B. Hipp and E. Gregory Stott for plaintiff appellant.*

*Joyner and Howison and Moore & Van Allen for defendant appellee.*

SHARP, Chief Justice.

[1]   For the reasons stated in the opinion of the Court of Appeals we agree that the General Assembly intended Article 8 to apply to all public utilities doing business in this State whether they be foreign or domestic corporations and even though they are also engaged in interstate commerce.

G.S. 62-160 provides that *no public utility* shall pledge its credit or property for the benefit of any bondholder or stockholder or any affiliated business interest without first applying to and receiving permission from the Commission so to do. G.S. 62-161 (a) provides, *inter alia,* that *no public utility* shall issue any securities unless and until, and then only to the extent that, after investigation by the Commission of the purposes and uses of the proposed issues, the Commission by order authorizes such issue. "Public utility," as used in Article 8 and defined by G.S. 62-3 (23) a.6 includes any corporation, "whether organized under the laws of this State or under the laws of any other state or country, now or hereafter owning or operating in this State equipment or facilities for: . . . [c]onveying or transmitting messages or communications by telephone or telegraph, or any other means of transmission, where such service is offered to the public for compensation." G.S. 62-171, which authorizes the Commission "to agree" with any corresponding agency which is empowered by another state to regulate and control the amount and character of securities to be issued by a public utility doing business in such state and in this State, clearly contemplated the Commission's regulation of a public utility which is also engaged in interstate commerce.

To construe Article 8 according to Southern Bell's contentions would set at naught the express words of the foregoing

statutes. A statute must be construed as written and where, as here, the language is clear and unambiguous, the Court must give it its plain and definite meaning. 7 N.C. Index 2d, *Statutes* § 5 (1968).

[3]   The question presented by the Commission's appeal to this Court is whether, as applied to Southern Bell, Commission's Rule R1-16, that "[n]o public utility shall pledge its assets, issue securities, or assume liabilities of the character specified in G.S. 62-160 and 62-161, except after application to and approval by the Commission," imposes an undue burden on interstate commerce in contravention of the Commerce Clause of the United States Constitution. The Court of Appeals held that "constitutional limitations apply under the factual situation presented by this case to prevent the Commission from enforcing the provisions of Article 8 against Southern Bell," and we also affirm that holding.

[2]   Indisputably Southern Bell is engaged in interstate commerce. The business of conducting telecommunications between persons in different states constitutes interstate commerce subject to the regulation of Congress. 15 C.J.S., *Commerce* § 31 (1967). "[I]t is not only the right, but the duty, of Congress to see to it that intercourse among the States and the transmission of intelligence are not obstructed or unnecessarily encumbered by State legislation." *Pensacola Tel. Co. v. West. Union Tel. Co.,* 96 U.S. 1, 9, 24 L.Ed. 708, 710 (1877). *See* 15 Am. Jur. 2d, *Commerce* § 2 (1964).

In the four states in which Southern Bell operates its total investment in telephone plants on 31 December 1972 amounted to $4,740,000.000. Of this sum, approximately 42% was invested in Florida; 28½% in Georgia; 17% in North Carolina; and 11½% in South Carolina. Of the 8,282,000 telephones Southern Bell had in service on that date, about 12% were in South Carolina; 18% in North Carolina; 29% in Georgia; and 41% in Florida. More than 30% of the operating revenues received by Southern Bell from provision of communications services in the four states is attributable to its interstate operations.

During the five years between 1967 and 1972, Southern Bell's total investment in telephone plants increased approximately 50%, and it sold debentures and intermediate-term notes to the public in the amount of $1,075,000,000. Between 1968 and 1972, construction costs increased more than 44%. During 1973

Utilities Comm. v. Telegraph Co.

these costs were expected to be about $1,030,000,000, and more than one-half of this amount would have to come from the sale of debentures and additional equity investment by A.T. & T. In all but six working days during 1972, Southern Bell made short term borrowings, and, in the past five years, one securities issue of long term and intermediate-term debt has been made each year. Southern Bell's entire credit and net income are pledged to the payment of the issue. The proceeds are used to meet the company's needs and objectives in the four states in which it operates but none of the securities are earmarked for use in a particular state.

As the Court of Appeals pointed out, "Under the stipulated facts there can be no question that Southern Bell's continued capability to provide facilities adequate for its ever-growing business, including its interstate business, is directly dependent upon its continuing issuance of securities. It is apparent that at least for the foreseeable future a very large portion of the tremendous volume of capital funds required simply cannot be raised in any other way. Therefore, State regulation and control over issuance of these securities will necessarily involve a large degree of State regulation and control over Southern Bell's ability to carry on its interstate activities." *Utilities Comm. v. Telegraph Co.*, 22 N.C. App. 714, 720, 207 S.E. 2d 771, 775 (1974).

Clearly the right to raise money to carry on the business of interstate telecommunications is an essential part of the operation for, if the utility cannot secure funds through the sale of its securities, it cannot function. If the Commerce Clause is broad enough to include telecommunications, it is broad enough to include the means without which such communication cannot be furnished. *Whitman et al, Public Service Commission v. Northern Cent. Ry. Co.*, 146 Md. 580, 589, 127 A. 112, 115 (1924).

To date Congress has not acted to place the regulation of the securities of interstate utilities under a single governmental agency. Nor has the United States Supreme Court dealt with a case involving a state's attempt to regulate the issuance of securities by a utility engaged in multi-state operations. *See Laird v. Baltimore & Ohio R. R. Co.*, 121 Md. 179, 191-192, 88 A. 348, 352 (1913) ; State Regulation of Interstate Utility Securities—The Need for a Reappraisal, 32 Journal of Air Law

and Commerce 262 (1966). General principles governing analogous situations, however, are relevant and controlling.

Where Congress has not regulated a matter of interstate commerce, the Commerce Clause protects the national commerce from inimical state legislation without the necessity of such legislation. The absence of federal regulation does not empower the state to directly regulate or materially burden interstate commerce. The Supreme Court will invalidate local regulations which impinge either directly or indirectly upon the means or instruments employed in that commerce. At the same time it leaves to the states wide scope for the regulation of matters of local concern, even though the regulation incidentally affects commerce, "provided it does not materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern." *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 769-770, 65 S.Ct. 1515, 1520-1521, 89 L.Ed. 1915, 1924-1925 (1945). *See Bibb v. Navajo Freight Lines,* 359 U.S. 520, 523-524, 79 S.Ct. 962, 964-965, 3 L.Ed. 2d 1003, 1006-1007 (1959) ; *Western Union Telegraph Co. v. Kansas ex rel. Coleman,* 216 U.S. 1, 26, 30 S.Ct. 190, 197, 54 L.Ed. 355, 365 (1910) ; 15 C.J.S., *Commerce* § 14 (1967).

The postulate applicable to this case is that "state legislation is invalid if it unduly burdens that commerce in matters where uniformity is necessary—necessary in the constitutional sense of useful in accomplishing a permitted purpose. Where uniformity is essential for the functioning of commerce, a state may not interpose its local regulation." *Morgan v. Commonwealth of Virginia,* 328 U.S. 373, 377, 66 S.Ct. 1050, 1053, 90 L.Ed. 1317, 1322 (1946).

The case of *South Covington & C Street R. Co. v. Covington,* 235 U.S. 537, 35 S.Ct. 158, 59 L.Ed. 350 (1915), involved an ordinance of the City of Covington, Kentucky, which purported to impose certain requirements upon a street railway corporation transporting passengers across an interstate bridge over the Ohio river into Cincinnati. In invalidating the ordinance as a direct burden upon interstate commerce and beyond the power of the State, the Supreme Court said: "If Covington can regulate these matters, certainly Cincinnati can, and interstate business *might* be impeded by conflicting and varying regulations in this respect, with which it might be impossible to comply. On one side of the river one set of regulations *might*

be enforced, and on the other side quite a different set, and both seeking to control a practically continuous movement of cars. . . . '[C]ommerce cannot flourish in the midst of such embarrassments.'" (Emphasis added.) *Id.* at 547-548, 35 S.Ct. at 161, 59 L.Ed. at 354.

In part, the Supreme Court of Illinois duplicated the rationale of *Covington* when it decided *United Air Lines, Inc. v. Illinois Commerce Commission,* 32 Ill. 2d 516, 207 N.E. 2d 433 (1965). At that time the system of United Air Lines, a corporation engaged in providing air transportation for persons, property, and mail between 110 cities in 32 states and the District of Columbia, consisted of 17,420 route miles, of which 158 were within Illinois. In holding that the Illinois Commerce Commission had no jurisdiction to require United to secure its authorization before issuing its securities, the Court said:

"The power given the Commission to approve or disapprove the issuance of stocks and securities necessarily affects United's interstate activities, for if it cannot secure funds through the sale of its stocks and securities its continued existence in the highly competitive interstate air transportation industry would be difficult, if not impossible, to sustain. . . .

"If Illinois can exercise the power to approve or disapprove the issuance of United's securities because it transacts business here, then so also can each of the other sixteen States where United provides intrastate service. There would thus be a total of seventeen jurisdictions asserting the power to approve or reject any issuance of stock proposed by United. The task of seeking and gaining approval from such a number of States would be unjustifiably expensive, time consuming and burdensome, and could create delay which would directly impair the usefulness of United's facilities for interstate traffic. Just as important, each independent regulating authority would be required to apply locally defined standards of public interest and locally defined rules in order to approve or disapprove or, as our statute suggests (sec. 21), to conditionally approve a single issuance of securities. The result, we believe, would be chaotic. The issuance of securities is a single, indivisible act. It cannot be fractionalized and given portions allocated to specific States.

"It is suggested by the Commission that it is not proper to consider the 'possibility' of multi-state regulation and its effects, the implication being that the limitations on the powers of a

State over interstate commerce could not come into effect until there is an actual attempt at multiple regulation or an actual obstruction of commerce. The cases, however, reject this view and demonstrate that the possibility of conflict or dual regulation, may be sufficient to curtail powers sought to be asserted by an individual State over interstate commerce where such commerce might be impeded by conflicting and varying regulations. See: *South Covington & Cincinnati Street Railway Co. v. City of Covington,* 235 U.S. 537, 35 S.Ct. 158, 59 L.Ed. 350, 354; *Southern Pacific Co. v. State of Arizona,* 325 U.S. 761, 773-775, 65 S.Ct. 1515, 89 L.Ed. 1915, 1927-1928; *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed. 2d 1003; Application of United Air Lines, Inc., 172 Neb. 784, 112 N.W. 2d 414; cf. *Bethlehem Steel Co. v. New York State Labor Relations Board,* 330 U.S. 767, 775, 67 S.Ct. 1026, 91 L.Ed. 1234, 1247." *Id.* at 525-526, 207 N.E. 2d at 437-438. *See In re Application of United Air Lines, Inc.,* 172 Neb. 784, 791-792, 112 N.W. 2d 414, 419 (1961); 64 Am. Jur. 2d, *Public Utilities* § 263 (1972).

We find the reasoning of the Illinois Court in *United Air Lines, Inc. v. Illinois Commerce Commission, supra,* inescapable.

[3] Any requirement for prior approval, by its very nature, contemplates that such approval may not be given. If the North Carolina Commission disapproves a proposed securities issue and the Georgia Commission approves it, Southern Bell is stymied, for it is put in an impossible position. In our view, the mere possibility of such a conflict, as applied to Southern Bell under the facts of this case, makes Rule R1-16, and the statutes which authorize the rule, a direct regulation and an impermissible burden on interstate commerce.

Further, should the North Carolina Commission attempt to exercise its asserted power to authorize or disapprove a securities issue, G.S. 62-161 requires that it investigate "the purposes and uses of the proposed issue and the proceeds thereof" before doing so. As Judge Parker noted in his cogent opinion in this case, "[T]he inevitable consequence would be that the Commission would be required to inquire into and pass upon the needs of Southern Bell and its customers in Florida, Georgia, and South Carolina, matters which are clearly beyond the Commission's lawful authority." 22 N.C. App. at 721, 207 S.E. 2d at 776.

Foods, Inc. v. Super Markets

On the stipulated facts, the decision of the Court of Appeals which reversed the order of the North Carolina Utilities Commission is

Affirmed.

Justices COPELAND and EXUM did not participate in the hearing or decision of this case.