(Nos. 39139, 39140, 39141 Cons.—

NATURAL GAS PIPELINE COMPANY OF AMERICA *et al.,* Appellees, *vs.* ILLINOIS COMMERCE COMMISSION, Appellant.

*Opinion filed September 28, 1965.*

KLINGBIEL, C.J., took no part.

WILLIAM G. CLARK, Attorney General, of Springfield, (EDWARD G. FINNEGAN and HAROLD A. COWEN, Assistant Attorneys General, of counsel,) for appellant.

ROSS, HARDIES, O'KEEFE, BABCOCK, McDUGALD & PARSONS, of Chicago, (CLARENCE H. ROSS, JOSEPH H. MUELLER, and HELMUT WALLENFELS, of counsel,) for appellees.

HARRY R. BERLEY, of Chicago, *amicus curiae*.

Mr. JUSTICE HOUSE delivered the opinion of the court:

The question presented is whether the Illinois Commerce Commission has the authority under section 21 of the Public Utilities Act, (Ill. Rev. Stat. 1959, chap. 111⅔, par. 21,) to regulate, and under section 31 (par. 31) to assess fees on, securities issued by interstate natural gas pipeline companies for the purpose of financing the construction and acquisition of facilities which are subject to regulation by the Federal Power Commission under the Natural Gas Act of 1938. 15 U.S.C.A. sec. 717 *et seq.*

On March 27, 1963, the Illinois Commerce Commission entered orders holding that it had authority under section 21 of the Public Utilities Act to regulate the issuance of securities issued by Natural Gas Pipeline Company of America, Natural Gas Storage Company of Illinois and Chicago District Pipeline Company. The circuit court of Will County reversed the orders of the Commission on the ground that the Federal government has pre-empted the regulation of the issuance of securities by natural gas companies when these companies are subject to regulation under the Natural Gas Act.

Natural Gas Pipeline Company of America, a Delaware corporation, produces and purchases natural gas and operates a natural gas transmission system, consisting of two divisions, for the transportation and sale of the gas. One of its division pipelines extends from gas fields in Northern Texas and Western Oklahoma across Oklahoma, Kansas, Nebraska, Iowa and Illinois to terminal points near Joliet, Illinois, and near Genoa City, Wisconsin, at the Illinois-Wisconsin boundary line. Its other division pipelines extend from gas fields in the Texas Gulf Coast area across Texas, Arkansas, Missouri and Illinois to terminal points near Joliet and Volo, Illinois. The transportation and sale of all natural gas transported by Natural Gas Pipeline, the operation of facilities by it and the construction and acquisition of new facilities are all authorized under certificates of public convenience and necessity issued by the Federal Power Commission.

Prior to its merger into Natural Gas Pipeline Company (pursuant to an order of the Federal Power Commission), Natural Gas Storage Company of Illinois was an Illinois corporation engaged in the business of transporting and storing during off-peak periods (for delivery to customers during days of peak requirements) natural gas owned by customers of Natural Gas Pipeline. All of its customers were also customers of Natural. The gas delivered to the

storage company for account of Natural's customers, as well as that purchased by it from Natural, was received from the pipeline system of Natural at points of connection in Illinois and transported by the storage company to its storage reservoirs at Herscher and Cook Mills, Illinois. Upon request of customers owning the gas, the storage company would remove the quantity requested and transport it back to the pipeline system of Natural. The storage company is subject to the jurisdiction and regulation of the Federal Power Commission and its pipeline and storage facilities were constructed and installed, as well as operated and maintained, under certificates of public convenience and necessity obtained from the Federal Power Commission. All of the operations conducted by the storage company prior to its merger into Natural are now conducted by Natural.

Chicago District Pipeline Company is an Illinois Corporation engaged in the business of transporting natural gas from the transmission systems of Natural and Midwestern Gas Transmission Company to the local gas distributing systems of Peoples Gas Light and Coke Company, the Northern Illinois Gas Company and the Northern Indiana Public Service Company. Chicago District originally operated under a certificate of authority issued by the Illinois Commerce Commission in April 1936. After the United States Supreme Court ruled in *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.* 314 U.S. 498, 62 S. Ct. 384, 86 L. ed. 371, that a company whose pipeline system is wholly in one State may nevertheless be subject to regulation under the Natural Gas Act, Chicago District obtained a certificate of public convenience and necessity from the Federal Power Commission. All of Chicago District's pipeline facilities are operated and maintained pursuant to authority contained in certificates of public convenience and necessity issued to it by the Federal Power Commission.

Section 21 of the Public Utilities Act (Ill. Rev. Stat.

1963, chap. 111⅔, par. 21,) authorizes a public utility to issue securities for the construction, acquisition and extension of its facilities, provided the utility "shall first have secured from the commission an order authorizing such issue and stating the amount thereof and the purpose or purposes to which the issue or the proceeds thereof are to be applied, and that in the opinion of the commission, the money, property or labor to be procured or paid for by such issue is reasonably required for the purpose or purposes specified in the order, * * *" and among the broad regulatory powers granted in the section the Commission is given the power "to refuse its approval of applications to issue securities, in whole or in part, upon a finding that the issue of such securities would be contrary to public interest."

Section 7(c) of the Natural Gas Act, (15 U.S.C.A. sec. 717f(c),) provides that, "No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations * * *." Section 7(e) (15 U.S.C.A. sec. 717f(e),) gives the Commission "the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."

The Federal Power Commission in the exercise of its authority under sections 7(c) and 7(e) has required applicants for certificates of public convenience and necessity to file plans of financing satisfactory to it in support of their applications. (See *e.g.* Kansas Pipe Line & Gas Co., 2 F.P.C. 29; Tennessee Gas and Transmission Co., 3 F.P.C. 574;

Cities Service Transportation & Chemical Co. 3 F.P.C. 598; Transcontinental Gas Pipe Line Corp. 9 F.P.C. 32; Permian Basin Pipeline Co. *et al.,* 12 F.P.C. 85; Houston Texas Gas & Oil Corp. *et al.,* 16 F.P.C. 118, aff'd *sub nom.; Florida Economic Advisory Council* v. *Federal Power Com.* (D.C. cir.) 251 F.2d 643; Midwestern Gas Transmission Co. 21 F.P.C. 653.) Thus, while the Natural Gas Act does not give the Federal Power Commission explicit authority to regulate security issues, the Commission has, nevertheless, exercised authority similar to that granted to the Illinois Commerce Commission under section 21 of the Public Utilities Act. This exercise of authority by the Federal Power Commission has, of course, been with respect to financing the construction or extension of facilities subject to its jurisdiction, but the proceeds of the security issues here involved are to be used for the expansion of facilities subject to regulation by the Federal Power Commission.

In the recent case of *Federal Power Com.* v. *Hunt,* 376 U.S. 515, 84 S. Ct. 861, 11 L. ed. 2d 878, the Supreme Court considered the Commission's authority to condition its issuance of a certificate of convenience and necessity under sections 7(c) and 7(e). It observed that sections 7(c) and 7(e) were added to the Natural Gas Act in 1942, four years after its original passage and "* * * were designed to control the certification of gas destined for interstate movement. The purpose of the amendments was to give 'the Commission an opportunity to scrutinize the financial set-up, the adequacy of the gas reserves, the feasibility and adequacy of the proposed services, and the characteristics of the rate structure * * * at a time when such vital matters can readily be modified as the public interest may demand. * * *.' House Committee on Interstate and Foreign Commerce, HR Rep No. 1290, 77th Cong., 1st Sess. 2-3." (U.S. Congressional Service 1942, p. 188.) After quoting a similar statement of purpose from the Senate Committee on Interstate Commerce, the court con-

cluded, "Clearly, the Commission was given the power to lay down conditions precedent to the entry of the natural gas into interstate commerce. Moreover, the Commission has long recognized this obligation and has required modification of many tariff and contract provisions as a condition to the granting of a certificate." 376 U.S. 515, 525, 526, 84 S. Ct. 861, 867-868, 11 L. ed. 2d 878, 885.

After considering that the purpose of sections 7(c) and 7(e) was to give the Federal Power Commission "an opportunity to scrutinize the financial set-up" of an applicant, that "the Commission was given the power to lay down conditions precedent" to the granting of a certificate of public convenience and necessity, and, as we have pointed out, "the Commission has long recognized this obligation, and has required" the filing of a satisfactory financial plan, we conclude that the Federal Power Commission has authority to regulate the issuance of securities issued to finance the acquisition and construction of facilities subject to its jurisdiction. See *Federal Power Com.* v. *Hunt,* 376 U.S. 515, 84 S. Ct. 861, 11 L. ed. 2d 878.

The Commerce Commission apparently concedes that the Federal Power Commission has this authority, but it argues, nevertheless, that State and Federal regulation of financing of facilities subject to regulation by the Federal Power Commission can logically and practically coexist. It points out that the regulation by Illinois is for a different purpose and of a different scope than the regulation which can reasonably be expected on the part of the Federal government; the first being interested in the local effects of a proposed extension, the second in rates and services and the financial ability of the company with respect to the maintenance of adequate and reasonable rates and service. The Commerce Commission relies principally upon the cases of *People* v. *County Transportation Co.* 303 N.Y. 391, (appeal dismissed for want of a substantial Federal question, 343 U.S. 961, 72 S. Ct. 1062, 96 L. ed. 1359,) *Rice* v. *Santa Fe*

*Elevator Corp.* 331 U.S. 218, 67 S. Ct. 1146, 91 L. ed. 1447, in support of this argument.

The question presented in the *County Transportation Co.* case was whether New York could regulate a $159,655.90 conditional sales contract executed by an interstate bus line company. It was held that section 314 of Title 49 (49 U.S.C.A. sec. 314) did not pre-empt the State from regulating conditional sales contracts. The court was careful to point out, however, that "section 314 of title 49 extends regulation only to motor carriers which have issued securities of a par value in excess of $500,000. According to the agreed statement of facts, the par value of defendant's outstanding securities, plus the face value of the conditional sales contract in question have never exceeded $500,000." 303 N.Y. 391, 103 N.E.2d 421, 424-425.

In *Santa Fe Elevator Corp.* the Supreme Court held that the United States Warehouse Act, as amended, (28 U.S.C.A. secs. 2320-2327) superseded State authority to regulate licensees under the act with respect to activities covered by the act but that the State could regulate the activities of such licensees where the act contained no provision relating expressly thereto. Specifically the court held that the Illinois Commerce Commission could, under section 21 of the Public Utilities Act, regulate the issuance of securities by a licensee under the Federal act. The court in so holding rejected the contention that State regulation of financing might interfere with regulation by the Federal government.

We note initially that the historical basis of the United States Warehouse Act and the Natural Gas Act are materially different. In enacting the Warehouse Act, "Congress legislated * * * in a field which the States have traditionally occupied." The court, therefore, started "* * * with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (331

U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. ed. 1447, 1459.) The Natural Gas Act, on the other hand, was enacted to regulate that area which the Supreme Court had held that the States were without power to regulate. (*Panhandle Eastern Pipe Line Co.* v. *Public Service Com. of Indiana,* 332 U.S. 507, 68 S. Ct. 190, 92 L. ed. 128.) Furthermore the Secretary of Agriculture had made no attempt to regulate security issues under the United States Warehouse Act (331 U.S. 218, 237, 67 S. Ct. 1146, 1155) and "While a warehouseman need not operate under the Act, if he chose to be licensed under it, he would then 'be authorized to operate without regard to State acts and be solely responsible to the Federal act.' " 331 U.S. 218, 233, 67 S. Ct. 1146, 1154, 91 L. ed. 1447, 1461.

On the other hand Congress under section 7(c) (15 U.S.C.A. sec. 717f(c),) has given plenary authority to the Federal Power Commission to regulate extensions of companies subject to the Natural Gas Act. (*Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.* 314 U.S. 498, 62 S. Ct. 384, 86 L. ed. 371.) And, as we have pointed out, the Federal Power Commission has authority to regulate the issuance of securities issued to finance the acquisition and construction of facilities subject to its jurisdiction. (See *Federal Power Com.* v. *Hunt,* 376 U.S. 575, 84 S. Ct. 861, 11 L. ed. 2d 878.) Finally, we recognize that when a State regulation would directly or indirectly "affect the ability of the Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act" or creates the "prospect of interference with the federal regulatory power," then the State regulation must yield "although collision between the state and federal regulation may not be an inevitable consequence." *Northern Natural Gas Co.* v. *State Corporation Com. of Kansas,* 372 U.S. 84, 91-92, 83 S. Ct. 646, 651, 9 L. ed. 2d 601, 607-8.

There is, of course, a close and vital connection between a company's rates, services and facilities on the one hand and its means and method of financing on the other. (See *United Air Lines, Inc.* v. *Illinois Commerce Com.* 32 Ill.2d 516.) This conclusion is supported by the fact that one of the stated purposes of the 1942 amendments to the Natural Gas Act was to give the Federal Power Commissions "an opportunity to scrutinize the financial set-up" of an applicant "at a time when such vital matters can be readily modified as the public interest may demand." (House Committee on Interstate and Foreign Commerce, HR Rep. No. 1290, 77th Cong., 1st Sess. 2-3, U.S. Congressional Service 1942, p. 188.) This being true, it is apparent that the regulation of securities under section 21 of the Public Utilities Act would create the "prospect of interference with the federal regulatory power" over plans for financing the construction or extension of facilities subject to jurisdiction of the Federal Power Commission.

We hold, therefore, that the Illinois Commerce Commission is without authority to regulate the issuance of securities issued by natural gas pipeline companies to finance the construction and acquisition of facilities subject to the jurisdiction of the Federal Power Commission under section 7 of the Natural Gas Act.

This holding makes it unnecessary to consider other points raised and argued. The judgment of the circuit court of Will County is affirmed.

*Judgment affirmed.*

Mr. CHIEF JUSTICE KLINGBIEL took no part in the consideration or decision of this case.