ANR PIPELINE COMPANY and ANR
Storage Company,
Plaintiffs-Appellants,

v.

Eric J. SCHNEIDEWIND, Matthew E. McLogan and Edwyna G. Anderson, Defendants-Appellees.

No. 85–1762.

United States Court of Appeals, Sixth Circuit.

Argued July 21, 1986.

Decided Sept. 15, 1986.

R. Philip Brown, Asst. Atty. Gen., Lansing, Mich., Don L. Keskey (argued), for defendants-appellees.

John C. Jones (argued), Mika, Meyers, Beckett & Jones, Grand Rapids, Mich., Elizabeth C. Keller, for plaintiffs-appellants.

Before KENNEDY and BOGGS, Circuit Judges, and BROWN, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

This appeal presents two questions: (1) Whether the Natural Gas Act ("NGA"), codified at 15 U.S.C. §§ 717–717w, preempts the Michigan public utilities securities regulation law, 1909 Mich.Pub.Acts No. 144 ("Act 144"), codified at Mich. Comp. Laws § 460.301,[1] which requires

**1.** Mich.Comp. Laws § 460.301 provides in pertinent part:

(1) A ... corporation, association, or individual exercising or claiming the right to carry or transport natural gas for public use, directly or indirectly ... or engaged in the business of piping or transporting natural gas for public use, directly or indirectly, or engaged in the business of purchasing natural gas for distribution may issue stocks, bonds, notes, or other evidences of indebtedness payable at periods of more than 12 months after the date of issuance, if necessary for the acquisition of property, the construction, completion, extension, or improvement of facilities or for the improvement or maintenance of service or for the discharge or lawful refunding of obligations and may issue stock to represent accumulated earnings invested in capital assets and not previously capitalized, if the Michigan public service commission issues an order authorizing the issue and the amount of the issue, and states that in the opinion of the commission the use of the capital or property to be acquired to be secured by the issue of the stock, bonds, notes, or other evidences of indebtedness, is reasonably required for the purposes of the person, corporation, or association, or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized....

(2) A person, corporation, or association desiring authority to issue stocks, bonds, notes, or other evidences of indebtedness shall make written application to the commission in the form as the commission requires. After receiving the application, the commission, for the purpose of determining whether the commission should grant the authority, may make an inquiry or investigation, hold hearings, and examine witnesses, books, papers, documents, or contracts the commission considers of importance in enabling it to reach a determination. An interested person, including municipalities and organizations whose membership consists of a substantial number of ratepayers within the service area of the utility, shall have the right to intervene as provided in the rules of the commission. If the applicant fails, neglects, or refuses to furnish the information required by the commission, or if the commission directs, an appraisal of the property of the applicant shall be made by a disinterested person to be appointed by the commission and whose compensation shall be fixed by the commission.

The entire expense of making the appraisal shall be borne by the applicant. After the appraisal is made and filed with the commission and before any action is taken by the commission upon the application, the expenses of the appraisal as determined by the commission shall be paid by the applicant to the commission, which shall deposit the amount in the treasury of the state to be credited to the general fund, taking the receipt of the treasurer for the deposit and filing the receipt in the commission's office with the application. If the applicant refuses or neglects to pay the expense of the appraisal, the commission shall dismiss the application and the commission may bring an action against the applicant in a court of competent jurisdiction in this state for the recovery of the expense of the appraisal. The expense of the appraisal shall be paid by the state treasurer to the person certified by the commission to be entitled to the appraisal fee.

(3) If from the application filed and other information obtained from the investigation authorized in this act the commission is satisfied that the funds derived from the issue of stocks, bonds, or notes are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes, or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized, the commission shall grant authority to make the issue. In granting the authority, the commission may impose as a condition of the grant reasonable terms and conditions that the commission considers proper.

(4) A person, corporation, or association may issue notes for lawful purposes, payable at periods of not more than 24 months, without authority from the commission; but the notes shall not in whole or in part, be refunded by an issue of stock or bonds or by an evidence of indebtedness running for more than 12 months without the consent of the commission.

....

(8) This act shall not apply to a person, corporation, or association which is engaged in the business of carrying, transporting, piping, purchasing for distribution, or selling natural gas into this state, which derives less than 5% of its consolidated gross revenues from all of its operations from natural gas operations in this state, and which does not

public utilities, including "natural-gas companies" as defined under the NGA in 15 U.S.C. § 717a(6), operating in Michigan to obtain the approval of the Michigan Public Service Commission ("MPSC") before issuing long-term [2] securities; and (2) Whether Act 144 violates the Commerce Clause of the United States Constitution. The United States District Court for the Western District of Michigan, 627 F.Supp. 923, held that federal law did not preempt Act 144 and that Act 144 did not violate the Commerce Clause. For the reasons stated below, we hold that the NGA implicitly preempts Act 144. In addition, we hold that Act 144 unconstitutionally burdens interstate commerce. Accordingly, we reverse the judgment of the District Court.

Plaintiffs-appellants, ANR Pipeline Company ("Pipeline"), a Delaware corporation, and ANR Storage Company ("Storage"), a Michigan corporation, originally brought this action against MPSC seeking a declaratory judgment that MPSC could not constitutionally require them to obtain MPSC's advance approval before issuing and selling long-term securities. After MPSC filed a motion to dismiss the complaint on several grounds including the Eleventh Amendment, plaintiffs-appellants filed a motion for leave to file an amended complaint adding the three members of MPSC, defendants-appellees Eric J. Schneidewind, Matthew E. McLogan, and Edwyna G. Anderson, in their official capacities, as additional parties. On September 7, 1984, the District Court filed an order granting plaintiffs-appellants' motion to file an amended complaint. The order also dismissed MPSC as a defendant. Plaintiffs-appellants have not appealed from that order.

The parties stipulated that the District Court should decide the case on the basis of a stipulation of facts, an appendix to the stipulation of facts, plaintiffs-appellants' answers to three sets of interrogatories, and plaintiffs-appellants' replies to two sets of requests for admissions. After hearing oral arguments, the District Court ruled that plaintiffs-appellants could not lawfully issue and market long-term securities without obtaining a prior order of approval from MPSC. The District Court further declared that defendants-appellees, in their official capacities as members of MPSC, have the jurisdiction and authority to regulate, approve or disapprove the issuance of plaintiffs-appellants' long-term securities.

## FACTS

Plaintiffs-appellants are wholly-owned subsidiaries of American Natural Resources Company ("ANR"), a diversified holding company incorporated in Delaware. The principal offices of all three companies are located in Detroit, Michigan. Since plaintiffs-appellants are "natural-gas companies," [3] the Federal Energy Regulatory Commission ("FERC") exercises general regulatory jurisdiction over their facilities and operations, including transportation, storage, sales (for resale), rates and charges, construction of new facilities, extension or abandonment of service and facilities, and certain other matters. This jurisdiction includes the authority to review and consider specific long-term financing plans for particular construction projects. FERC, however, does not review plaintiffs-

---

offer residential natural gas service to the general public under rules promulgated by the Michigan public service commission.

**2.** The statute contains an exception that generally allows utilities to issue notes payable over periods not exceeding two years without obtaining MPSC's approval. Mich.Comp. Laws § 460.-301(4).

**3.** Title 15 U.S.C. § 717a(6) defines a "natural-gas company" as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for

resale." Defendants-appellees argue that Storage is not a "natural-gas company" because gas storage does not qualify as "the transportation [or sale] of natural gas in interstate commerce." We cannot agree. In *Columbia Gas Transmission Corp. v. Exclusive Gas Storage Easement*, 776 F.2d 125 (6th Cir.1985), this Court recognized that "the transportation of natural gas in interstate commerce" includes the storage of natural gas by stating: "Underground gas storage facilities are a necessary and integral part of the operation of piping gas from the area of production to the area of consumption." *Id.* at 129 (quoting the district court's opinion).

appellants' short-term financing or nonconstruction financing. Because plaintiffs-appellants do not use any facilities in, or otherwise engage in, any local or intrastate natural gas operations of any kind, MPSC does not exercise general regulatory jurisdiction over plaintiffs-appellants' facilities or operations.

Pipeline owns and operates an interstate natural gas pipeline system which transports and sells gas, for resale only, to 51 gas distribution customers in Michigan, Wisconsin, Iowa, Illinois, Indiana, Kansas, Missouri, Ohio, and Tennessee. Pipeline does not have any direct retail customers in Michigan and does not have plans for any. Although Pipeline derives most of its revenues from the sale of gas at wholesale, Pipeline also provides storage and transportation services for other gas companies by using extensive underground gas transmission pipelines and gas storage facilities located in Michigan and in other states.

Pipeline purchases natural gas from producers in Texas, Oklahoma, Kansas, Louisiana, and Wyoming and uses large diameter, cross-country pipelines to transport the gas, primarily to the states of Michigan and Wisconsin. During 1983, Pipeline sold 555 billion cubic feet of gas to its customers; over fifty percent of Pipeline's 1983 sales were in Michigan, approximately forty-five percent in Wisconsin and less than five percent in other states. Pipeline delivers all the gas that the company transports to Wisconsin directly to gas distribution utilities for immediate resale to their customers. Pipeline delivers most of the gas transported to Michigan directly to gas distribution utilities but also occasionally injects relatively minor volumes of gas into storage.

ANR organized Storage in 1978 to develop and operate gas storage reservoirs to store gas for non-affiliated customers. Storage operates four storage fields in the northern portion of Michigan's lower peninsula. Storage does not sell natural gas.

During the summer, Storage receives natural gas from another pipeline company and stores the gas in one or more of the four storage fields.[4] Upon demand of its customers, Storage redelivers the natural gas to the pipeline company. All of the natural gas that Storage stores comes from outside the state of Michigan. Upon withdrawal of the natural gas from Storage's facilities, Storage's customers ultimately use the gas outside of Michigan.

Since its creation in 1939 and except for the period 1970–1979, MPSC has exercised authority over the securities that Pipeline or its predecessor, Michigan Wisconsin Pipe Line Company, has issued. After the decision of the Michigan Court of Appeals in *Great Lakes Transmission Co. v. Michigan Pub. Serv. Comm'n*, 24 Mich.App. 77, 180 N.W.2d 59 (1970), MPSC advised Pipeline (then Michigan Wisconsin Pipe Line Company) that, pursuant to the advice of its legal division, MPSC did not have jurisdiction to regulate the issuance of Pipeline's securities. Accordingly, Pipeline did not file securities applications from 1970 until the decision of the Supreme Court of Michigan in *Michigan Gas Storage v. Public Serv. Comm'n*, 405 Mich. 376, 275 N.W.2d 457, *reh'g denied*, 406 Mich. 1118 (1979). After that decision, Pipeline has filed seven applications to issue securities. All seven applications raised the question of MPSC's jurisdiction, but the parties have not litigated the issue until now.

Since 1979, MPSC has approved all seven of Pipeline's applications to issue securities. In each case, MPSC granted authorization for Pipeline to issue and sell the amount and type of securities that Pipeline had requested. In one instance, MPSC did not grant authorization for the issuance until slightly more than eight months after Pipeline applied for the authorization. MPSC granted the other six authorizations in between three and six weeks. On one occasion, however, Pipeline filed an application for approval of proposed security is-

---

**4.** In the natural gas industry, pipeline companies commonly employ a practice known as "displacement," whereby the companies ex-change equivalent volumes of natural gas at a mutually convenient place in lieu of actual physical delivery of the gas.

suances which included guaranteeing certain financing by a subsidiary company. Instead of promptly approving the application as it had done in the past, MPSC issued a "Notice of Inquiry" and set the matter for hearing. Thereafter, Pipeline withdrew the original application and filed a substitute application, which omitted the guarantee. MPSC approved the substitute application.

MPSC has also exercised authority over securities that Storage has issued since 1979. During that time, MPSC has unconditionally approved all three of Storage's applications in between three and six weeks. On one occasion, however, Storage withdrew an application after a MPSC representative advised the company that MPSC would hold hearings on the application. After ANR and MPSC reached a settlement regarding ANR's divestiture of Michigan Consolidated Gas Company, Storage filed a substitute application which MPSC approved. Storage's applications also raised the issue of MPSC's jurisdiction.

Since the natural gas industry is a capital-intensive industry, the issuance of various forms of securities is an essential aspect of plaintiffs-appellants' businesses. Pipeline, for example, uses short-term debt to finance the build-up of gas balances until the heating season begins and to finance capital expenditures, such as the construction of natural gas transmission and storage facilities, pending long-term financing. Pipeline uses various forms of long-term financing including common and preferred stock, first mortgage bonds, debentures, and unsecured notes. Pipeline plans to issue approximately 50 million dollars in securities in 1986, not including potential refunding of debts, and approximately 100 million dollars in securities during 1987. Pipeline plans to use the proceeds from such securities issuances to assist in financing construction projects costing approximately 560 million dollars. Of this total, Pipeline plans to spend approximately 50 million dollars constructing projects in the state of Michigan. Storage plans to issue 27 million dollars in securities during 1987. FERC requires the filing of an application for a "certificate of public convenience and necessity" on these projects and may impose specific conditions on financing.

Plaintiffs-appellants use national and international financial markets to issue and sell their securities. When plaintiffs-appellants need capital, they usually hire an international Wall Street investment banker to raise the required funds. The investment banker explores the international and national financial markets, determines the most advantageous method and source of raising the necessary funds, and proceeds with the issuance and marketing of the securities. In some cases, however, plaintiffs-appellants have obtained financing directly from national or international banks. In all cases, Michigan investors are involved with these security issuances only to the extent that they operate and invest in these international and national financial markets.

## DISCUSSION

### I.

■ Initially, plaintiffs-appellants contend that since FERC exclusively regulates their operations, facilities, and rates and since all their operations constitute the transportation or sale of natural gas in interstate commerce, the NGA has preempted Act 144's provision requiring "natural-gas companies" to obtain MPSC's approval before issuing long-term securities. In *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), the Supreme Court summarized the basic principles governing the federal preemption of state regulation:

> Pre-emption may be either express or implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604] (1977). Absent explicit pre-emptive language, Congress' intent to supersede state law altogether may be inferred because

"[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947).

Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941).

*Id.* at 152–53, 102 S.Ct. at 3022 (additional citations omitted).

Applying this analytical framework, we note that Michigan enacted a predecessor to Act 144 in 1909. We agree with the District Court that "neither the NGA nor the federal Securities Act of 1933 ... contains express preemptive language with respect to utilities securities transactions...." Accordingly, we conclude that Congress has not explicitly preempted Act 144.

Having concluded that Congress has not explicitly preempted Act 144, we next consider whether federal law implicitly preempts the "advance approval" form of securities regulation. During this inquiry, we "start [ ] with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S.

725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed.2d 1447 (1947)). As recently as *Wardair Canada, Inc. v. Florida Dep't of Revenue*, —— U.S. ——, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986), the Supreme Court stated:

> [W]e have consistently emphasized that the first and fundamental inquiry in any pre-emption analysis is whether Congress intended to displace state law, and where a congressional statute does not expressly declare that state law is to be pre-empted [sic], and where there is no actual conflict between what federal and state law prescribe, we have required that there be evidence of a congressional intent to pre-empt the specific field covered by the state law.

*Id.* 106 S.Ct. at 2372 (citations omitted).

The Supreme Court has acknowledged that both the NGA and the Natural Gas Policy Act of 1978 ("NGPA"), codified at 15 U.S.C. §§ 3301–3432, form a "comprehensive" national gas policy. *See Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Bd.*, —— U.S. ——, 106 S.Ct. 709, 716, 88 L.Ed.2d 732 (1986). Although both the NGA and the NGPA contemplate a "comprehensive gas policy," neither the NGA nor the NGPA contain an "advance approval" form of utility securities regulation. Such omissions in a "comprehensive" regulatory scheme arguably preempt state regulation in the field. In *Transcontinental Gas Pipe Line Corp.*, the Supreme Court stated:

> A federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much preemptive force as a decision *to* regulate.

*Id.*, 106 S.Ct. at 717 (quoting *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983)) (emphasis in original). Consequently, we conclude that by not requiring the "advance approval" of the issuance of securities by "natural-gas

companies" in an otherwise "comprehensive" regulatory scheme, Congress has implicitly determined that the States should not impose such regulations.

Furthermore, by requiring "natural-gas companies" to submit detailed financing plans as part of the application process for a "certificate of public convenience and necessity," FERC, at least implicitly, regulates those financing plans. Under 15 U.S.C. § 717f(c)(1)(A), a "natural-gas company" must obtain a "certificate of public convenience and necessity" before con-

structing, expanding, acquiring, or operating any facility involved in the transportation or sale of natural gas.[5] Under its regulatory authority, FERC has promulgated extensive regulations entitled "Applications for Certificates of Public Convenience and Necessity and for Orders Permitting and Approving Abandonment Under Section 7 of the Natural Gas Act, as Amended, Concerning Any Operation, Sales, Service, Construction, Extension, Acquisition or Abandonment." *See* 18 C.F.R. Part 157, Subpart A. As part of those regulations, 18 C.F.R. § 157.14(a)(14)[6] re-

---

5. Title 15 U.S.C. § 717f(c)(1)(A) provides in pertinent part:

No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations . . . .

6. Title 18 C.F.R. § 157.14(a) (1985) provides in pertinent part:

(a) *To be attached to each application.* All exhibits specified shall accompany each application when tendered for filing. Together with each exhibit applicant shall set forth a full and complete explanation of the data submitted, the manner in which it was obtained, and the reasons for the conclusions which are derived therefrom. . . .

. . . .

(14) *Exhibit L–Financing.* Plans for financing the proposed facilities for which the application is filed, together with:

(i) A detailed description of applicant's outstanding and proposed securities and liabilities, showing amount (face value and number), interest or dividend rate, dates of issue and maturity, voting privileges, and principal terms and conditions applicable to each.

(ii) The manner in which applicant proposes to dispose of securities by private sale, competitive bidding or otherwise; the persons, if known, to whom they will be sold or issued together with letters of intent, if any, and if not known, the class or classes of such persons.

(iii) A statement showing for each proposed issue, by total amount and by unit, the estimated sale price and estimated net proceeds to the applicant.

(iv) An itemized statement of estimated expenses, fees, and commissions to be paid by

applicant in connection with each proposed issue.

(v) A statement showing whether the consent of any holder of any security is necessary to permit the issuance of the additional securities proposed, and whether, as to the proposed issue of securities, a like restriction is to be made applicable to any securities issued thereafter.

(vi) Statement of anticipated cash flow, including provision during the period of construction and the first 3 full years of operation of proposed facilities for interest requirements, dividends, and capital retirements.

(vii) Statement showing, over the life of each issue, the annual amount of securities which applicant expects to retire through operation of a sinking fund or other extinguishment of the obligation.

(viii) A balance sheet and income statement (12 months) of most recent date available.

(ix) Comparative pro forma balance sheets and income statements for the period of construction and each of the first 3 full years of operation, giving effect to the proposed construction and proposed financing of the project.

(x) Conformed copies of all agreements, contracts, mortgages, deeds of trust, indentures, agreements to advance materials or supplies or render services in return for applicant's securities, underwriting agreements, and any other agreements or documents of a similar nature.

(xi) Conformed copies of all reports, letters, or other documents, submitted by applicant to underwriters, insurance companies, or others regarding financing, including business studies, forecasts of earnings, and other similar financial or accounting reports, statements, or documents.

(xii) Conformed copies of all applications and supporting exhibits, registration statements, or other similar submittals, if any, to the Securities and Exchange Commission, including all supplements, changes or modifications of the above.

quires an applicant to file with FERC a detailed plan for financing, including a description of the proposed securities as to amount, interest or dividend rate, date of issuance, principal terms and conditions, estimated expenses, manner of issue, manner of extinguishment of the obligation, and other pertinent information.[7] Under 15 U.S.C. § 717f(e), FERC has "the power to attach to the issuance of the certificate [of public convenience and necessity] and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." By requiring "natural-gas companies" to submit information regarding financing as part of the application process for a "certificate of public convenience and necessity" and then issuing the certificate, FERC, at least implicitly, has approved the financing plan.

Using a preemption analysis, in *Natural Gas Pipeline Co. v. Illinois Commerce Comm'n*, 33 Ill.2d 214, 210 N.E.2d 490 (1965), the Supreme Court of Illinois held that the Illinois Commerce Commission did not have the authority to regulate the issuance of securities that natural gas companies issue to finance the construction and acquisition of facilities subject to the jurisdiction of the Federal Power Commission, the predecessor of FERC, under the NGA. The court noted that Congress amended section 7 of the NGA, four years after its original passage. *See* Act of February 7, 1942, ch. 49, 56 Stat. 83. In *Federal Power Comm'n v. Hunt*, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964), the Supreme Court stated:

> The purpose of the amendments was to give "the Commission an opportunity to scrutinize the financial set-up, the adequacy of the gas reserves, the feasibility and adequacy of the proposed services, and the characteristics of the rate structure ... at a time when such vital matters can readily be modified as the public

interest may demand...." House Committee on Interstate and Foreign Commerce, H.R.Rep. No. 1290, 77th Cong., 1st Sess., 2–3.

*Id.* at 525, 84 S.Ct. at 867. Finally, the court rejected the Illinois Commerce Commission's argument that both federal and state regulation could logically and practically exist:

> [W]hen the State regulation would directly or indirectly "affect the ability of the Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act" or creates the "prospect of interference with the federal regulatory power," then the State regulation must yield "although collision between the state and federal regulation may not be an inevitable consequence." *Northern Natural Gas Co. v. State Corp. Comm['n] of Kansas*, 372 U.S. 84, 91–92, 83 S.Ct. 646, 651, 9 L.Ed.2d 601, 607–608.

210 N.E.2d at 494.

Once FERC has approved a project and the underlying financing plan, a state cannot reject either the project or the financing plan. Even if Congress has not implicitly displaced state regulation in the natural gas industry, the Supremacy Clause invalidates state regulation to the extent that it conflicts with federal regulation. The "advance approval" form of state regulation involved in this case presents at least the possibility of a conflict between federal and state regulation. A direct conflict between FERC and MPSC could easily occur where FERC, acting in the national interest, authorizes the construction of facilities in a state other than Michigan, requiring the issuance of additional securities, and MPSC, acting in a perceived local interest, refuses to approve the issuance of securities. For example, FERC could ap-

---

(xiii) Any additional data and information upon which applicant proposes to rely in showing the adequacy and availability to it of resources for financing its proposed project.

**7.** We note that in *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta,* the Supreme Court stated: "Federal regulations have no less pre-emptive effect than federal statutes." 458 U.S. at 153, 102 S.Ct. at 3022.

prove a "natural-gas company's" request to build a $1 billion pipeline to Maine because the Northeast needs additional supplies of natural gas even though the project would increase the cost of natural gas by ten percent to all consumers served by this pipeline. Since the pipeline would raise the cost to Michigan consumers without a "local" benefit, MPSC might reject the proposal.

Although MPSC has not rejected a securities issuance or project that FERC had previously approved, the "imminent possibility" of such an occurrence requires that we declare Act 144 unconstitutional. In *Maryland v. Louisiana,* 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981), the Supreme Court stated that the " 'imminent possibility of collision' " between the Louisiana tax on the "first use" of natural gas and FERC's authority required that the Court hold the Louisiana tax unconstitutional. *See also Northern Natural Gas Co. v. State Corp. Comm'n,* 372 U.S. 84, 92, 83 S.Ct. 646, 651, 9 L.Ed.2d 601, *reh'g denied,* 372 U.S. 960, 83 S.Ct. 1011, 10 L.Ed.2d 14 (1963) ("although collision between the state and federal regulation may not be an inevitable consequence, there lurks such [an] imminent possibility of collision in orders purposely directed at interstate wholesale purchasers that the orders must be declared a nullity in order to assure the effectuation of the comprehensive federal regulation ordained by Congress"). Consequently, we hold that the NGA and the accompanying federal regulations implicitly preempt Act 144.

## II

■ Plaintiffs-appellants additionally argue that Act 144 violates the commerce clause. We agree. As recently as *Brown-Forman Distillers Corp. v. New York State Liquor Auth.,* —— U.S. ——, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), the Supreme Court summarized the analysis the Court applies when determining whether state regulation violates the commerce clause:

This Court has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry.... When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). We have also recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.

106 S.Ct. at 2084 (citation omitted). In *Brown-Forman Distillers Corp.,* the Supreme Court held that a New York law, requiring every liquor distiller or producer that sells liquor to wholesalers within the State to sell at a price that does not exceed the lowest price the distiller charges wholesalers anywhere else in the United States, violated the commerce clause under the first tier. The Supreme Court reasoned: "Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce." *Id.* at 2086 (citations omitted). Likewise, in this case, a requirement that plaintiffs-appellants obtain "advance approval" from MPSC before issuing securities, the proceeds of which may be used to finance a project in another State, directly regulates interstate commerce. Consequently, we hold that Act 144 directly burdens interstate commerce.

Accepting the Supreme Court's analysis in *Brown-Forman Distillers Corp.* that "there is no clear line separating the cate-

gory of state regulation that is virtually *per se* invalid ... and the category subject to the *Pike v. Bruce Church* balancing approach," 106 S.Ct. at 2084, we proceed to the second tier. In *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the Supreme Court applied a "balancing of interests" test to determine whether state regulation exceeds commerce clause limitations:

> Where [a] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 142, 90 S.Ct. at 847 (citation omitted).

Defendants-appellees argue that Act 144 serves several important objectives. In *Michigan Gas Storage v. Public Serv. Comm'n*, 405 Mich. 376, 275 N.W.2d 457 (1979), the Supreme Court of Michigan stated that:

> [O]ne of the goals of securities regulation ... was to protect investors against the evils of overcapitalization.... Proper securities regulation serves the interests of the ratepayers in assuring continued service without interruption from utilities and in receiving that service at reasonable rates. For example, physical property of a company within the state, essential to the company's ultimate service to the public, could be jeopardized by inadequate financing, resulting in a failure in that service.

*Id.* at 390–91, 275 N.W.2d 457. In essence, the District Court ruled that these benefits outweigh any burdens that Act 144 imposes on interstate commerce. We cannot agree. An analysis of the alleged benefits reveals that they do not further important state interests. The problem of overcapitalization is largely related to the construction, expansion, and acquisition of natural gas facilities. FERC, however, exercises sufficient control over such decisions by issuing "certificates of public convenience and necessity." We cannot see any benefit in MPSC's approving the financing for a project that FERC has already approved. Under the Supremacy Clause, MPSC cannot refuse to approve the issuance of securities for a project that FERC has already approved. FERC also regulates the rates that "natural-gas companies" can charge. Since plaintiffs-appellants do not engage in any intrastate sales of natural gas, MPSC cannot regulate plaintiffs-appellants' rates.[8]

Several state courts have held that state regulation requiring advance approval for the issuance of securities by companies engaged in interstate commerce unconstitutionally burdens interstate commerce. *See, e.g., Panhandle Eastern Pipeline Co. v. Public Utilities Comm'n*, 56 Ohio St.2d 334, 383 N.E.2d 1163 (1978); *State Utilities Comm'n v. Southern Bell Telephone and Telegraph Co.*, 288 N.C. 201, 217 S.E.2d 543 (1975); *United Air Lines, Inc. v. Illinois Commerce Comm'n*, 32 Ill.2d 516, 207 N.E.2d 433 (1965); *In re United Air Lines, Inc.*, 172 Neb. 784, 112 N.W.2d 414 (1961). *Contra Michigan Gas Storage v. Public Serv. Comm'n*, 405 Mich. 376, 275 N.W.2d 457, *reh'g denied*, 406 Mich. 1118 (1979); *Indiana and Michigan Power Co. v. Public Serv. Comm'n*, 405 Mich. 400, 275 N.W.2d 450, *reh'g denied*, 406 Mich. 1119 (1979). In *United Air Lines, Inc. v. Illinois Commerce Comm'n, supra*, the Supreme Court of Illinois held that the Illinois statute requiring the "advance

---

**8.** Defendants-appellees have adopted contradictory positions during this litigation. When discussing the burdens that Act 144 imposes on interstate commerce, defendants-appellees portray MPSC's approval of an application to issue securities as almost automatic. When discussing the benefits of Act 144, however, defendants-appellees emphasize MPSC's ability to influence the decision-making of natural gas utilities.

approval" of United's securities unconstitutionally burdened interstate commerce. During its discussion, the court stated:

> If Illinois can exercise the power to approve or disapprove the issuance of United's securities because it transacts business here, then so also can each of the other sixteen States where United provides intrastate service. There would thus be a total of seventeen jurisdictions asserting the power to approve or reject any issuance of stock proposed by United. The task of seeking and gaining approval from such a number of States would be unjustifiably expensive, time consuming and burdensome, and could create delay which would directly impair the usefulness of United facilities for interstate traffic. Just as important, each independent regulating authority would be required to apply locally defined standards of public interest and locally defined rules in order to approve or disapprove or ... to conditionally approve a single issuance of securities. The result, we believe, would be chaotic. The issuance of securities is a single, indivisible act. It cannot be fractionalized and given portions allocated to specific States.

207 N.E.2d at 438. We conclude that the burdens of expense, delay, and administrative hassle of "advance approval" securities regulation far outweigh the benefits, if any, of Michigan's interests in protecting consumers and investors. Consequently, we hold that Act 144 unconstitutionally burdens interstate commerce.

Accordingly, we reverse the judgment of the District Court and remand this action to the District Court with instructions to enter a declaratory judgment for plaintiffs-appellants.